## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KATHARINE ARCHER,

    Plaintiff,

    v.

CITY OF NEW ORLEANS, LATOYA
CANTRELL, SHAUN FERGUSON, JOHN
THOMAS, LEJON ROBERTS, BRYAN
LAMPARD, KENNY PREPETIT, TODD
MORRELL, MICHAEL CRAWFORD,
DYLEN PAZON, MICHAEL PIERCE,
DAMOND HARRIS, DEVIN JOSEPH,
JASON JORGENSON, AND TROY
JOHNSON,

    Defendants.

Case No. 2:21-cv-1079

# **COMPLAINT**

## INTRODUCTION

1.      On June 3, 2020, the New Orleans Police Department (NOPD) used military-style tactics and weaponry to respond to a protest against police violence following the police killing of George Floyd. The NOPD escorted the protest march through the City of New Orleans, only stopping the march after it had proceeded up the interstate onramp and onto the elevated portion of the Crescent City Connection bridge. It was there, over a hundred feet above the city, that the NOPD set up a skirmish line barricade, deployed its Special Operations Division SWAT team, and opened fire on the crowd with tear gas grenades, tear gas projectiles, and .60 caliber rubber projectiles.

2.      This is a case about a woman who was peacefully participating in that protest march with her college-aged daughters when NOPD officers hit her in the head with a flying tear gas grenade.

3.      The tear gas grenade, launched at the order of NOPD command staff and allowed by the lack of NOPD policy on the use of such weapons, split open Katharine Archer's head, causing a gash across her forehead that required 12 stiches. The force of the blow knocked her to the ground, breaking her tailbone. In the resulting stampede as protesters fled, Ms. Archer's daughters struggled to help her move away from the chemical clouds of tear gas and flying munitions. As blood poured down their mother's face, they screamed for help. No member of NOPD came to their assistance.

4.      The blow to her head from the tear gas grenade and the broken tailbone has caused Ms. Archer prolonged and severe neurological trauma. Over the past year she has suffered from cognitive delays, memory and speech loss, a stroke, and uncontrollable leg convulsions, requiring extended hospital stays, MRIs, spinal taps, cognitive therapy, speech therapy, and physical therapy. Her treatment is expected to continue into the foreseeable future, if not longer.

5.      This action seeks redress for the violations of the rights guaranteed to Katharine Archer by the Fourth and Fourteenth Amendments to the United States Constitution, as well as violations of state law by the named Defendants. Ms. Archer, by and through her attorneys, seeks all relief as detailed throughout this complaint and as requested below.

**NATURE OF THE ACTION**

6.      Ms. Archer brings this action under 42 U.S.C. § 1983 for deprivation of her rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

7. Ms. Archer also seeks redress of the assault, battery, negligent injury, and intentional infliction of emotional distress perpetrated on her by Defendants, pursuant to LA. CODE CIV. PROC. art. 2315.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's claims for violations of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as the state law claims are so related to Plaintiff's federal claims as to form part of the same case or controversy.

9. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1). All Defendants reside in the State of Louisiana, and all Defendants reside in the Eastern District of Louisiana. Pursuant to 28 U.S.C. § 1391(c)(2), the City of New Orleans also resides in the Eastern District.

## PARTIES

10. Plaintiff Katharine Archer is a resident of Orleans Parish, Louisiana. Ms. Archer was subjected to excessive force by officers of the New Orleans Police Department.

11. The City of New Orleans is a political entity capable of suing and being sued. The City of New Orleans is the entity responsible for ensuring the safety, welfare, and protection of members of the public within the City, and is responsible for the New Orleans Police Department.

12. Latoya Cantrell is a person of full age of majority and a resident of Orleans Parish, Louisiana. She is sued in her official capacity as Mayor of New Orleans and in her individual capacity. At all times pertinent, Mayor Cantrell was responsible for the supervision, administration, policies, practices, procedures, and customs for the City and the City's police department. She was responsible for the hiring, training, discipline, supervision, and control of the

New Orleans Police Department superintendent and officers who are defendants herein. Mayor Cantrell is a final policy maker.

13.     Shaun D. Ferguson is the Superintendent ("Chief") of the New Orleans Police Department ("NOPD"). Chief Ferguson is a person of full age of majority and a resident of Orleans Parish, Louisiana, and he is sued in his individual capacity and in his official capacity as the Superintendent of NOPD. At all times pertinent, Chief Ferguson was responsible for the supervision, administration, policies, practices, procedures, and customs for the City and the City's police department. He was responsible for the hiring, training, discipline, supervision, and control of the NOPD officers who are defendants herein. Chief Ferguson is a final policy maker. He is liable both directly and vicariously for the actions complained of herein. He was acting under color of law, and in the course and scope of his employment at all times pertinent.

14.     John Thomas is the Deputy Superintendent ("Deputy Chief") of the New Orleans Police Department and the Chief of the Department's Field Operations Bureau. Deputy Chief Thomas is a person of full age of majority and a resident of Orleans Parish, Louisiana, and he is sued in his individual and official capacities. At all times pertinent, Deputy Chief Thomas was responsible for the supervision, administration, policies, practices, procedures, and customs for the City and the City's police department. He was responsible for the hiring, training, discipline, supervision, and control of the NOPD officers who are defendants herein. On the night of June 3, 2020, Deputy Chief Thomas was the Incident Commander for NOPD. He gave the order to the Special Operations Division ("SOD") to report for duty as part of the NOPD protest response. Deputy Chief Thomas monitored the NOPD protest response live via Real Time Crime Camera footage and radio on June 3, 2020 and gave orders via radio to the police force. Deputy Chief Thomas is a final policy maker. He is liable both directly and vicariously for the actions

complained of herein. He was acting under color of law, and in the course and scope of his employment at all times pertinent.

15.     Lejon Roberts is a captain with the New Orleans Police Department. Captain Roberts is a person of full age of majority and a resident of Orleans Parish, Louisiana, and he is sued in his individual and official capacities. On the night of June 3, 2020 Captain Roberts was the On-Scene Incident Commander and the Operations Commander for NOPD. He was a member of command staff for the NOPD response to the protest. He was responsible for the supervision and control of the NOPD officers who are defendants herein and gave them orders, including the order to form a skirmish line of police officers across the elevated portion of the Crescent City Connection bridge to stop protesters at that location, the order summoning the Special Operations Division to the bridge, and the order to deploy tear gas munitions. He was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Captain Roberts was a final policy maker.

16.     Brian Lampard is a captain with the New Orleans Police Department. Captain Lampard is a person of full age of majority and a resident of Orleans Parish, Louisiana, and he is sued in his individual and official capacities. Captain Lampard is the head of the Special Operations Division of NOPD. On the night of June 3, 2020, Captain Lampard was the Tactical Commander for NOPD and was a member of command staff for the NOPD response to the protest. He was responsible for the supervision and control of the NOPD SOD officers who are defendants herein, including the grenadier unit, which deployed gas grenades and gas munitions into the crowd of protesters. Captain Lampard gave the order to deploy the grenadier unit, and gave the order to deploy gas at the protesters. He was acting under color of law, and in the course and scope

5

of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Captain Lampard is a final policy maker.

17.     Kenny Prepetit is a lieutenant with the New Orleans Police Department, and is the Assistant Commander of the Special Operations Division of NOPD.  He is a person of full age of majority and a resident of Orleans Parish, Louisiana, and he is sued in his individual and official capacities. On June 3, 2020 Lieutenant Prepetit was physically present on the Crescent City Connection to provide SOD support and to mobilize the SOD's tactical unit. Lieutenant Prepetit executed the order he received to prepare the Orange Team (the "gas deployment team," also referred to as the the grenadier and "less than lethal" munitions unit of SWAT and SOD) to deploy gas on the bridge, and then ordered the Orange Team to deploy gas. Lieutenant Prepetit observed his officers deploy gas on his command (and that of Captain Lampard) by throwing tear gas grenades by hand into the crowd of protesters on the bridge and by firing "Direct Impact" gas projectiles into the crowd using a 40 mm launcher. At all times described herein, Lieutenant Prepetit was responsible for the training, supervision, discipline, and control of those officers under his command, including the grenadier team housed within the Special Operations Division. He was also responsible for the supervision, administration, policies, practices, customs, and operations of NOPD. He was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Lieutenant Prepetit is a final policy maker.

18.     Todd Morrell is a sergeant with the New Orleans Police Department. Sergeant Morrell is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual and official capacities. Sergeant Morrell is in charge of NOPD's bomb squad unit and munitions, and oversees training for SOD and riot training for NOPD. Sergeant Morrell was

6

responsible for the training of NOPD officers and was responsible for the training, supervision, discipline, and control of the officers under his command. He was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Sergeant Morrell is a final policy maker.

19.     Michael Crawford is a sergeant with the New Orleans Police Department. Sergeant Crawford is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual and official capacities. Sergeant Crawford is in charge of training, equipment, and vehicles for the SOD in his role as head of armory. Sergeant Crawford issued munitions to the SOD officers on June 3, 2020, including gas grenades, gas projectiles, and stinger munitions. Sergeant Crawford was responsible for the training, supervision, discipline, and control of SOD officers. He was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Sergeant Crawford is a final policy maker.

20.     Dylen Pazon is an officer with the New Orleans Police Department. Officer Pazon is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual and official capacities. Officer Pazon is the lead trainer for SOD and trains officers on topics including the deployment of gas munitions. On June 3, 2020, Officer Pazon participated in the issuing of munitions to SOD officers and, later, was present on the Crescent City Connection bridge. Officer Pazon drove a "Bearcat" armored vehicle transporting a team of tactical officers to the location where NOPD had stopped the protest march on the bridge. He was also in charge of providing equipment and tools for the NOPD protest response. At times on the night of June 3, 2020, Officer Pazon was in control of the front line of officers and issued orders to those officers. He also directed the grenadier unit as to the deployment of gas munitions on the bridge. Officer

Pazon was responsible for the training, supervision, discipline, and control of SOD officers. Officer Pazon was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein. Officer Pazon is a final policy maker.

21.     Damond Harris is a sergeant with the New Orleans Police Department. Sergeant Harris is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual and official capacities. Sergeant Harris was present on the Crescent City Connection on June 3, 2020, and was the team leader of the Orange Team. Sergeant Harris heard the order to deploy gas, repeated the order to his team members, and observed the Orange Team members deploy gas munitions into the crowd of protesters by hand and by launcher. Sergeant Harris ordered one of the Orange Team members to retrieve additional gas projectiles (Direct Impact CS rounds), and marking rounds after the initial supply of gas grenades and projectiles had been deployed into the crowd of protesters. Sergeant Harris assisted the Orange Team members with deploying the munitions, including by helping them reload. At all times described herein, Sergeant Harris was responsible for the training, supervision, discipline, and control of those officers under his command. He was acting under color of law, and in the course and scope of his employment at all times pertinent. He is liable both directly and vicariously for the actions complained of herein.

22.     Travis Johnson is an officer with the New Orleans Police Department. He is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual capacity. Officer Johnson was present on the Crescent City Connection on June 3, 2020 as part of the Orange Team grenadier unit of SWAT and SOD. Officer Johnson carried a backpack containing CS gas grenades, Direct Impact CS gas launchable projectiles, green impact "marking"

rounds, and 60 mm rubber ball projectiles. Officer Johnson launched three gas grenades via hand. After launching his initial two gas grenades into the crowd, Officer Johnson picked up another gas grenade on the ground in the police-controlled zone of the bridge and threw it at the crowd of protesters. Officer Johnson was acting under color of law, and in the course and scope of his employment at all times pertinent.

23.     Jason Jorgenson is an officer with the New Orleans Police Department. He is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual capacity. Officer Jorgenson was present on the Crescent City Connection on June 3, 2020 as part of the Orange Team grenadier unit of SWAT and SOD. Officer Jorgenson deployed two tear gas grenades by throwing them over the front lines of officers and protesters, into the crowd of protesters, followed by another two tear gas grenades also thrown over the front line and into the crowd of protesters. Officer Jorgenson was acting under color of law, and in the course and scope of his employment at all times pertinent.

24.     Michael Pierce is a detective with the New Orleans Police Department. He is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual capacity. Detective Pierce was present on the Crescent City Connection on June 3, 2020 as part of the Orange Team grenadier unit of SWAT and SOD. Detective Pierce was armed with a 40 mm launcher capable of firing Direct Impact CS gas projectiles, and at times fired his launcher from the turret of the "Bearcat" armored vehicle into the crowd. Detective Pierce fired several rounds of gas projectiles in the direction of protesters via launcher. After exhausting his supply of gas munitions, Detective Pierce fired .60 mm rubber ball projectiles into the crowd of protesters. Detective Pierce was acting under color of law, and in the course and scope of his employment at all times pertinent.

25.     Devin Joseph is a detective with the New Orleans Police Department. He is a person of full age of majority and a resident of Orleans Parish, Louisiana, and is sued in his individual capacity. Detective Joseph was present on the Crescent City Connection on June 3, 2020 as part of the Orange Team grenadier unit of SWAT and SOD. Detective Joseph was armed with a 40 mm launcher loaded with six extended CS gas rounds. Detective Joseph positioned himself on top of an NOPD car and fired extended CS gas rounds into the crowd of protesters. He additionally fired 40 mm impact marking rounds at protesters via his launcher. Along with Officer Pazon, Detective Joseph was the gas munitions instructor for SOD. He is in charge of renewing SOD's munitions certifications every year. Detective Joseph was acting under color of law, and in the course and scope of his employment at all times pertinent.

26.     All Defendants in each count acted together and in concert in the actions which caused harm to the Plaintiff, and are therefore liable jointly and severally, or in solido, for Plaintiff's injuries.

## FACTUAL BACKGROUND

**I.      Katharine Archer was subjected to excessive force by Defendants during the June 3, 2020 protest by both the application of excessive force and the failure to intervene to prevent the use of excessive force.**

27.     Plaintiff incorporates by reference the allegations previously set forth in this complaint.

28.     Katharine Archer is a New Orleans schoolteacher and mother of two daughters. She goes by the name Katy. Ms. Archer's daughters, Abigail and Juliet, come home to New Orleans to live with their mother during the summer when they are on school break from college.

10

29.     On May 25, 2020, George Floyd was killed when a police officer knelt on his neck for eight minutes. The murder of Mr. Floyd sparked protests condemning police violence against Black and brown people across the country.

30.     Ms. Archer and her daughters were disheartened and upset by the police killing of George Floyd. They felt that, as white allies witnessing a nationwide pattern of police brutality against people of color, it was vital that they stand up in support of Black lives by participating in the New Orleans protests against police violence.

31.     Ms. Archer and her daughters participated in the civil rights protest marches in New Orleans during the last week of May 2020, as well as on the evenings of Monday, June 1st and Tuesday, June 2nd.

32.     On Tuesday, June 2nd, the protest march progressed through city streets and then up an overpass and entered the I-10 expressway. On the expressway, NOPD officers and command staff initially blocked the march from moving forward, but then knelt in solidarity with protesters. NOPD announced that the march could continue as long as protesters exited the expressway. Protesters and NOPD officers peacefully exited the expressway and continued the march.

33.     On Wednesday June 3, 2020, Katy Archer and her daughters again attended the New Orleans protest march calling for an end to police violence against people of color.

34.     The June 3rd march began at Duncan Plaza. From there, the march went down Loyola, turned left at Poydras, and turned right onto St. Charles Ave. The march continued down St. Charles Ave., proceeded past Lee Circle and stopped at the Wendy's on St. Charles.

35.     While the protest march was at a standstill at the St. Charles Ave. Wendy's, NOPD Deputy Chief John Thomas used the law enforcement protest response radio channel to coordinate the blocking of traffic heading towards the Westbank.

36.     Captain Lejon Roberts was the On-Scene Incident Commander for NOPD on June 3, 2020. Incident Commander Roberts instructed NOPD units over the protest response radio channel that if the march appeared to head to the interstate, not to prevent protesters from entering the interstate. Incident Commander Roberts instructed NOPD units that if the protest proceeded onto the interstate bridge, to contain protesters from both ends so that protesters cannot move further in either direction.

37.     Incident Commander Roberts was informed by an NOPD Lieutenant present with the protesters that the crowd of protesters was still located at the Wendy's on St. Charles and was peacefully protesting.

38.     The protest march continued down St. Charles Ave in an uptown direction.

39.     An as-yet unidentified NOPD officer asked over the NOPD protest response radio whether they would stop protesters from getting onto the bridge.

40.     A minute later Incident Commander Roberts again instructed over the NOPD protest response radio that NOPD should not prevent protesters from getting on the bridge. Incident Commander Roberts instructed NOPD units that if protesters entered the bridge, to contain them so that they cannot move freely.

41.     Meanwhile, the march proceeded from St. Charles Ave. left onto Jackson Ave. On Jackson Ave, protesters took a knee.

42.     Deputy Chief Thomas used the protest response radio channel to remind Incident Commander Roberts that NOPD Special Operations Division (SOD) forces were available for use on the bridge.

43.     Before the protest had begun that day, Deputy Chief Thomas had ordered that SOD forces, including the SWAT team, be ready for deployment as part of the NOPD protest response.

12

44.     SOD Sergeant Michael Crawford, head of armory, distributed special munitions to the SWAT team and specifically to the "gas team" (i.e., the "Orange Team"). Prior to the protest, Sergeant Crawford distributed at least 13 tear gas grenades of different varieties, 23 tear gas projectiles, 17 rounds of .60 caliber stinger rounds, a 40 mm launcher capable of launching the tear gas projectiles and rubber ball projectiles, 29 marking rounds, and 24 stinger rubber ball grenades.

45.     The march turned from Jackson Ave. left onto Magazine St., in the direction back towards the Central Business District. The march stopped next at Coliseum Square, where people ate red beans and rice and drank water. From there, the march continued in a downtown direction along Camp St. towards the 90 Business West onramp.

46.     At this point, Incident Commander Roberts stated over the radio that the Louisiana State Police believed that protesters intended to move across the Crescent City Connection to the Westbank in order to go to Jefferson Parish.

47.     The march proceeded up the Camp St. onramp onto 90 Business West expressway in the direction of the Westbank of New Orleans.

48.     Incident Commander Roberts observed that approximately 1,500 protesters were marching up the onramp. He relocated to the Crescent City Connection bridge and ordered NOPD units to form a skirmish line in order to stop the march from crossing the bridge. Deputy Chief Thomas was made aware of the decision to form a skirmish line on the bridge, stopping protesters from crossing.

49.     Incident Commander Roberts ordered the Special Operations Division to come to the skirmish line, which was formed across the bridge about 400 feet in front of protesters.

50.     Officer Dylen Pazon, SOD's lead trainer, was charged with transporting additional SOD special munitions to the bridge, and drove an armored vehicle (referred to as a "Bearcat") equipped with a turret, from which munitions can be fired, to the bridge.

51.     The protest march tried to proceed across the bridge, but was halted by the "skirmish line" barricade of officers clad in riot gear stretching across the road. Protesters waited for the NOPD skirmish line to let them cross.

52.     During this period of time that lasted no longer than ten minutes, protest leaders and NOPD command officers began to negotiate.

53.     Ms. Archer and her daughters waited in the crowd of protesters. They were several rows of people back from the front of the protest. They chanted "Hands up. Don't shoot" and waited for police to let the march pass. The crowd of protesters was peaceful. Some protesters in the crowd took out camping chairs and sat down to wait.

54.     Unbeknownst to Ms. Archer and her daughters, or to the rest of the protest march, Incident Commander Roberts informed Deputy Chief Thomas that he and Captain Bryan Lampard, the head of the Special Operations Division, had a plan in place in the event that the crowd began to push. Deputy Chief Thomas responded over the radio, telling Incident Commander Roberts to give three warnings, each a minute apart, if there was time.

55.     Thirty seconds later, Incident Commander Roberts informed Deputy Chief Thomas that his secondary line had put their gas masks on and that the front line of officers and protesters were in a shoving match. Deputy Chief Thomas responded saying "10-4, just give them the warnings." 10-4 is the police code for "acknowledged."

56.     Twenty seconds later, Incident Commander Roberts announced via radio that the front line of officers and protesters were fighting. Deputy Chief Thomas responded via radio

14

"Okay, y'all got gas?" Incident Commander Roberts immediately shouted the order "Deploy gas! Deploy gas! Deploy gas!"

57.     The order to deploy gas was repeated from Incident Commander Roberts down the line of command. Captain Bryan Lampard, the head of SOD, immediately repeated the order to deploy gas. Lieutenant Kenny Prepetit, assistant commander of SOD, then repeated the order to deploy gas. Sergeant Damond Harris, leader of the Orange Team, gave his team the order to deploy gas.

58.     The Special Operations Division "Orange Team" of five SWAT officers led by Sergeant Damond Harris and including officers Michael Pierce, Devin Joseph, Travis Johnson, and Jason Jorgenson, began to launch tear gas grenades and tear gas projectiles at the crowd of protesters, and then began to fire marking round projectiles and stinger rounds (.60 caliber rubber balls).

59.     At the same time, the "Snatch team" of NOPD officers began to place protesters on the front line in handcuffs.

60.     Incident Commander Roberts never issued the warnings to protesters before ordering his subordinates to deploy the tear gas munitions.

61.     Incident Commander Roberts gave the order to deploy tear gas into the crowd of protesters less than 10 minutes after NOPD had stopped the march on the bridge with the skirmish line of officers in riot gear barricading the road.

62.     Orange Team members Michael Pierce, Devin Joseph, Travis Johnson, and Jason Jorgenson were each armed with tear gas munitions that they deployed at protesters and, on information and belief, were the only officers to deploy tear gas munitions. One of the tear gas grenades  deployed by these four officers hit Katy Archer in the head, knocking her to the ground.

63.     Each of these officers, along with their team leader Damond Harris, were present with one another on the bridge, knew that they had all been given the order to deploy gas, and saw each other ready to deploy gas. Each of these officers, along with Damond Harris, had opportunity to observe the protesters and knew that those protesters beyond the front line of protesters had not caused problems or used force. Each of these officers, along with Damond Harris, knew that, especially given the height of the elevated expressway, deployment of tear gas was an excessive use of force that would cause danger to the protesters and others.

64.     Any and all of the Orange Team grenadier unit members, Pierce, Joseph, Johnson, and Jorgenson, and their superiors who were live-monitoring them, Thomas, Roberts, Lampard, Prepetit, Pazon, and Harris, could have intervened by verbally telling Orange Team officers to not deploy tear gas munitions at the protesters and/or to not deploy tear gas munitions at any protester who was behaving peacefully. Further, Pierce, Joseph, Johnson, Jorgenson, Roberts, Lampard, Prepetit, Pazon, and Harris were on scene and could have physically stopped the Orange Team officers from deploying tear gas munitions at the heads of people in the crowd. Yet, none of these Defendants intervened either verbally or physically to prevent the deployment of tear gas munitions at the head of Katy Archer, who was peacefully standing in the crowd with her daughters.

65.     Katy Archer and her daughters received no warning that tear gas was going to be deployed.

66.     Ms. Archer and her daughters saw movement at the front of the crowd and thought that the NOPD had decided to let the march pass. They were holding hands and waiting in anticipation when Ms. Archer was knocked to the pavement by a metal tear gas grenade hitting

her hard in the head. She lost grip of both her daughters' hands and she fell to the ground with force, landing on her tailbone.

67.     As the object fell to the ground after hitting her forehead, Ms. Archer saw it was a cylindrical metal object. She was immobilized on the ground.

68.     As Ms. Archer's daughters spotted their mother and went to pull her up from the ground, the metal tear gas grenade exploded and sprayed the three of them with tear gas, temporarily blinding them.

69.     People began to stampede away from the front line of police in response to the NOPD deployment of tear gas. Juliet and Abigail tried to pull their mother down the road away from the tear gas. Juliet lost her shoe in the stampede. As Juliet and Abigail held their mother up between themselves and tried to run with her, Juliet realized that her arm was wet, and looking down, saw that blood was running down from her mother's head, coating her arm.

70.     Ms. Archer began to struggle to breathe and to see. The blood running down her face from the gash in her forehead caused by the grenade had begun to pool in and around her eyes, and had soaked through her mask. Realizing how seriously their mother was hurt, Juliet and Abigail began to scream for a medic. Protesters around them joined in shouting for a medic. No member of the NOPD came to their assistance. Eventually, a volunteer medic from the crowd came and helped take Ms. Archer to the side of the road. The medic wrapped Ms. Archer's head and asked whether she was cognizant of the day and year.

71.     Ms. Archer and her daughters then tried to walk down the ramp in order to find a ride to a hospital. However, NOPD had reopened the onramps to traffic and as they walked down off the Crescent City Connection, oncoming traffic came up the onramp.

17

72.     Ms. Archer and her daughters eventually made it to the Ochsner Emergency Room on Jefferson Highway around eleven p.m., approximately one hour after having been hit by the tear gas grenade. At the Emergency Room, Ms. Archer was given 12 stiches across her head, and an x-ray, and was told by ER staff to shower because tear gas can have lasting effects if left on the skin.

73.     The following night, Ms. Archer began to have uncontrollable leg spasms and became unable to sleep. Over the course of the next two days, the spasms grew worse. Ms. Archer also began to realize that her severe tailbone pain, where she had hit the pavement after being knocked to the ground by the blow from the tear gas grenade, was not subsiding.

74.     Ms. Archer was admitted to the Emergency Room early on Sunday morning, June 7. After x-rays, she was diagnosed with a broken tailbone.

75.     Later that night, Ms. Archer had leg spasms of an increasingly violent nature. The spasms were so forceful that they physically lifted her off the bed. The convulsions moved into her upper body as well. Ms. Archer returned to the Emergency Room and was held overnight so that she could be examined by a neurologist.

76.     Ms. Archer had to be admitted to the hospital for multiple extended stays over the following weeks and months because of the head trauma and nerve damage caused by the blow to her head from the tear gas grenade and the ensuing broken tailbone.

77.     In addition to the spasms, Ms. Archer experienced severe headaches, motor skill delays, cognitive delays, memory loss, and loss of speech. As a result, she was unable to walk without assistance, unable to drive, unable to sleep through the night, and unable to use any electronics with screens.

78.     Ms. Archer's daughters delayed their returns to college for as long as possible in order to help care for her. Her daughters assisted her by driving her as needed, including to medical appointments—of which there were at least three a week, assisting her with walking and with stairs, communicating for her over phone and email, and grocery shopping, all of which she was unable to do because of the enduring symptoms of head trauma including severe headaches, delayed motor skills, and memory loss. After her daughters' return to college, Ms. Archer temporarily moved in with another family so that they could care for her.

79.     Ms. Archer had to undergo extensive cognitive therapy, which continued until May 2021.

80.     In January 2021 Ms. Archer suffered from a stroke and had to be admitted to the hospital for approximately one week following a CAT scan, spinal tap, and MRI.

81.     Ms. Archer was also deemed a fall risk and had to complete physical therapy, which ended in approximately March of 2021.

82.     The bills from Ms. Archer's multiple emergency room and hospital stays, neurologist visits, physical therapy, and cognitive therapy have been significant.

83.     The lasting physical trauma has compounded the extensive emotional trauma that Ms. Archer endured and still experiences.

84.     Ms. Archer will require continued monitoring and medical treatment, possibly for the remainder of her life, for the injuries, physical, neurological, and psychological, caused by the actions of the Defendants against her on June 3, 2020.

85.     Since June 3, 2020, Chief Ferguson and Mayor Cantrell have both ratified NOPD's deployment of tear gas against protesters on the bridge in multiple public statements. Defending the NOPD's June 3, 2020 protest response before the New Orleans City Council, Chief Ferguson

said "Should we use tear gas? I think it's best practice across the country." Chief Ferguson also publicly defended the NOPD decision to form a police barricade across the Crescent City Connection bridge. In a press conference on June 4, 2020, Chief Ferguson again ratified the NOPD use of force against protesters saying, "We had to deploy gas to disperse the crowd." That press conference, at which Chief Ferguson detailed his defense of NOPD's protest response was livestreamed and posted by Mayor Cantrell and stored on her mayoral Facebook profile under a headline characterizing the protest as "violent." One day later, Mayor Cantrell praised NOPD's protest response including their "swift" action on June 3, 2020 in her appearance on the Today Show.

II.    **NOPD's policy, training, and supervision failures resulted in the unjustified use of excessive force against Katharine Archer and the failure by NOPD officers to intervene.**

86.    On June 3, 2020, the New Orleans Police Department lacked a number of obvious and necessary policies, which, if enacted, trained on, and enforced, would have prevented the use of excessive force on Katharine Archer, and the failure of all present members of NOPD to intervene.

87.    The New Orleans Department Consent Decree, adopted by the Court on January 11, 2013, requires the NOPD to have policies for the use of all weapons. *United States of America v. City of New Orleans*, E.D. La., 12-cv-1924, ECF No. 2-1; *amended* ECF No. 565. Despite this requirement, NOPD had not adopted any policies specifically addressing the use of munitions commonly used by NOPD's Special Operations Division, including tear gas grenades, tear gas projectiles, and .60 caliber stinger rubber ball rounds.

88.    In particular, NOPD had no munitions policies addressing any of the following:

a.    Under what circumstances tear gas may be deployed;

b.  Whether any warning must be given prior to the deployment of tear gas at a civilian;

c.  The manner in which tear gas grenades may be deployed at civilians, including whether or not tear gas grenades may be deployed at civilians' heads and bodies, or whether such munitions must be rolled on the ground;

d.  Whether tear gas grenades and projectiles may be deployed at civilians who have not exhibited any signs of force or flight,

e.  Whether tear gas grenades and projectiles may be deployed at peaceful protesters, and

f.  Whether tear gas grenades and projectiles may be deployed against civilians in an elevated location.

89.    NOPD's only policy addressing the use of gas munitions authorized the Special Operations Division commander to deploy gas at their discretion. This authorization to deploy gas without any limitations as to time, place, and manner effectively authorized gas deployment under any circumstances.

90.    The NOPD was aware that its officers regularly used tear gas munitions, including tear gas grenades and projectiles. NOPD's Special Operations Division uses tear gas munitions on approximately 80% of SWAT deployments. It was NOPD's policy, custom, and practice to arm its officers with these munitions and to deploy these munitions. Weapons including tear gas grenades and projectiles were purchased by the NOPD and added to the armory for the purpose of arming its SOD officers.

91.     Thus, the NOPD was aware that the failure to have any gas munitions policy—particularly in light of its custom and practice of frequently arming and deploying gas munitions—exposed civilians to deployment of gas by any means, and at any time that SOD is deployed.

92.     When NOPD final policy maker Deputy Chief and Field Operations Bureau Chief John Thomas assigned SOD to NOPD's protest response on June 3, 2020, he did so with the knowledge that SOD officers would respond to the protest ready to deploy their standard SOD munitions including tear gas grenades and projectiles.

93.     When Incident Commander Lejon Roberts ordered SOD to come to the bridge, he did so with the knowledge that SOD officers would respond to the protest ready to deploy their standard SOD munitions including tear gas grenades and projectiles, which he then ordered them to deploy immediately upon their arrival.

94.     Despite the frequency with which NOPD's Special Operations Division deployed gas munitions at civilians, the NOPD's Use of Force policy did not address tear gas munitions whatsoever. NOPD's Use of Force policy designates different levels of force, specifying which types of force (e.g., deployment of particular weapons) are classified as levels of force that must be reported. Tear gas grenades and tear gas munitions were not included as uses of force that must be reported.

95.     The requirement to report uses of force following an incident, and the review of such reports, is essential for NOPD to determine whether its policies have been violated by individual officers' uses of force (and in particular whether excessive force was used), whether existing policy is effective to prevent constitutional violations, and whether there are further NOPD policies or trainings necessary to prevent constitutional violations. The failure of NOPD to require the report of uses of force involving the deployment of gas grenades and projectiles

obviously and foreseeably results in a lack of supervision, training, and disciplining of any officer deploying gas munitions incorrectly or in a time, place, or manner that is constitutionally excessive.

96.     Additionally, NOPD lacked the following necessary policies that gave rise to the constitutional violations against Katharine Archer that directly resulted in the serious injuries and personal damage to her:

   a.   Policies regarding responding to First Amendment assemblies or protests, and specifically including requirements limiting the use of force against peaceful protesters, and authorizing the use of force only against individual protesters who have exhibited the threat of force;

   b.   Policies requiring de-escalation and communication in crowd control situations;

   c.   Policies requiring the intervention of any officer where the constitutional rights of civilians are being or about to be violated by fellow law enforcement, even where those officers may be their superiors;

   d.   Policies requiring officers to refuse to follow orders where following orders will result in the violations of constitutional rights of civilians; and

   e.   Policies requiring the provision of medical assistance to civilians injured by the NOPD.

97.     Defendants Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford, Pazon, Harris and Joseph acted with deliberate indifference in failing to train, supervise, and discipline NOPD officers to prevent them from using constitutionally excessive levels of force, and in developing, implementing, maintaining, and repeatedly failing to correct policies (and

policy deficits), customs, and practices that give rise to constitutional violations, including the constitutional violations that directly resulted in harm to Katharine Archer on June 3, 2020.

**III. The failure to train NOPD officers by Defendants Morrell, Crawford, Pazon, and Joseph resulted in the unjustified use of excessive force against Katharine Archer and the failure by NOPD officers to intervene.**

98.     In their respective work assignments regarding the training of NOPD Special Operations Division Officers, Defendants Morrell, Crawford, Pazon, and Joseph were responsible for educating and training SOD officers in (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

99.     Sergeants Morrell and Crawford and Pazon are in charge of training for the Special Operations Division.

100.     Officers Pazon and Joseph are the gas munitions instructors for the Special Operations Division, who are responsible for training SOD officers in the deployment of such munitions and certifying the NOPD regarding gas munitions.

101.     Morrell, Crawford, Pazon, and Joseph failed to train officers on (a) the limits on their uses of force imposed by the Fourth and Fourteenth Amendments to the Constitution, and (b) the duty of a law enforcement officer to intervene to prevent or stop another law enforcement officer from violating the constitutional rights of a civilian, specifically including the right to be free from excessive force.

102.     In the course of their failures to train and supervise, Defendants disregarded the known or obvious consequences of the above-mentioned deficiencies in policies, training, and supervision, specifically including these known or obvious consequences:

a.  That SOD officers such as the members of the Orange Team grenadier unit would deploy tear gas grenades and projectiles in a manner such that Katharine Archer was struck in the head by these munitions on June 3, 2020; and

b.  That SOD officers such as the members of the Orange Team grenadier unit would fail to intervene to stop the uses of force employed by their fellow Orange Team grenadier unit members against Katharine Archer, which each was present for, observed, and knew or should have known constituted excessive force in violation of the Fourth and Fourteenth Amendments.

## CLAIMS FOR RELIEF

### COUNT ONE

#### INDIVIDUAL VIOLATIONS OF THE FOURTH AND FOURTEENTH AMENDMENTS' PROHIBITION ON EXCESSIVE FORCE, PURSUANT TO 42 U.S.C. § 1983

#### (JOHNSON, PIERCE, JORGENSON, JOSEPH, THOMAS, ROBERTS, LAMPARD, PREPETIT, AND HARRIS IN THEIR INDIVIDUAL CAPACITIES)

103.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

104.    By launching or throwing tear gas grenades, one of which struck Ms. Archer while she was peacefully protesting at a location allowed by NOPD, Defendants Johnson, Pierce, Jorgenson, and/or Joseph used unnecessary, unreasonable, and excessive force against Katharine Archer, depriving her of rights, privileges, and immunities secured to her by the Fourth and Fourteenth Amendments to the United States Constitution.

105.     Defendants Thomas, Roberts, Lampard, Prepetit, and Harris proximately caused the use of unnecessary, unreasonable, and excessive force against Katharine Archer by their supervisees, Johnson, Pierce, Jorgenson, and Joseph by their actions and failures to act.

106.     At all times pertinent, Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, and Harris were acting under color of law and were aware that uses of force without justification and/or legal cause are unlawful.

107.     As a result of the unnecessary, unreasonable, and excessive force caused by Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, and Harris, Katharine Archer suffered injury and damage.

108.     Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, and Harris, in their individual capacities, are jointly and severally, and in solido, liable to Ms. Archer for violating her Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.

## COUNT TWO

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS' PROHIBITION ON FAILURE TO INTERVENE (BYSTANDER LIABILITY), PURSUANT TO 42 U.S.C. § 1983

### (JOHNSON, PIERCE, JORGENSON, JOSEPH, THOMAS, ROBERTS, LAMPARD, PREPETIT, HARRIS, AND PAZON IN THEIR INDIVIDUAL CAPACITIES)

109.     Plaintiff incorporates by reference the allegations previously set forth in this complaint.

110.     Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon were each present at the scene of the use of excessive force against Ms.

26

Archer and did not take reasonable measures to protect Ms. Archer from the other officers' use of excessive force.

111.    Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon each realized, before Ms. Archer was injured, the excessive nature of the force and knew that the other officers were violating the constitutional rights of Katharine Archer; each officer had a reasonable opportunity to prevent the harm; each officer knew of their duty to intervene to prevent excessive force; and each officer chose not to act.

112.    Orange Team grenadier unit members Johnson, Pierce, Jorgenson, and Joseph could have verbally or physically intervened when they heard the order to deploy gas and watched each other ready themselves with gas munitions in order to prevent each other from deploying gas at protesters in the crowd.

113.    Roberts, Lampard, Prepetit, and Harris could each have physically or verbally intervened after issuing the order to deploy tear gas to their subordinates, and being physically present and observing as the Orange team members readied themselves with gas munitions, some of them aiming at the heads of protesters.

114.    Thomas could have intervened verbally as he live-monitored the NOPD protest response and gave orders via radio. Thomas instructed Roberts that three warnings should be given, each one minute apart, prior to deployment. Yet, Thomas heard Roberts issue the order to deploy gas only twenty seconds after Thomas instructed him to give warnings prior to deployment, making it impossible for Roberts to have given any warning. Thomas could have ordered Roberts and all NOPD officers via radio to desist deployment of gas munitions until adequate warnings were given to protesters and/or to not deploy gas munitions against any peaceful protester.

115.    Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon each acquiesced in the use of excessive force by the other officers.

116.    As a result of the failure of Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon to intervene to prevent or stop the infliction of excessive force on her, Katharine Archer suffered injury and damage.

117.    Defendants Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon, in their individual capacities, are jointly and severally, and in solido, liable to Ms. Archer for violation of her Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.

### COUNT THREE

### FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE OFFICERS JOHNSON, PIERCE, JORGENSON, JOSEPH AND HARRIS PURSUANT TO 42 U.S.C. § 1983

### (MORRELL, CRAWFORD, PAZON, AND JOSEPH IN THEIR INDIVIDUAL CAPACITIES)

118.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

119.    In their roles as heads of training for SOD, Morrell, Crawford, and Pazon failed to train, supervise, and/or discipline their subordinates, namely SOD Officers Johnson, Pierce, Jorgenson, Joseph, and Harris, to ensure that these subordinates did not violate the Fourth and Fourteenth Amendment rights of the members of the public they encounter in their duties. In their roles as gas munitions instructors for SOD, Pazon and Joseph failed to train, supervise, and discipline SOD officers to ensure that these officers did not deploy gas munitions in a time, place, and manner that violates the Fourth and Fourteenth Amendment rights of members of the public. Morrell, Crawford, Pazon, and Joseph also failed to train, supervise, and/or discipline Johnson,

Pierce, Jorgenson, Joseph, and Harris on the constitutional duty of a bystander officer to intervene to prevent or stop a constitutional violation by another law enforcement officer.

120.    These failures to train, supervise, and/or discipline were moving forces behind the excessive use of force against Ms. Archer as well as the failure to intervene. At all pertinent times herein, Morrell, Crawford, Pazon, and Joseph were aware of the need to supervise, train, and discipline their subordinates in order to ensure that they did not violate the rights of members of the public. Morrell, Crawford, Pazon, and Joseph ignored that need and acted unreasonably and with deliberate indifference and disregard for Katharine Archer's constitutional rights, as described above.

121.    Defendants Morrell, Pazon, Crawford, and Joseph, in their individual capacities, are jointly and severally, and in solido, liable to Ms. Archer for violation of her Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.

## COUNT FOUR

### SUPERVISORY LIABILITY CLAIM FOR FAILURE TO ESTABLISH POLICIES, RESULTING IN INJURY TO KATHARINE ARCHER AND SUBJECTING HER TO EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS, PURSUANT TO 42 U.S.C. § 1983

### (CANTRELL, FERGUSON, THOMAS, ROBERTS, LAMPARD, PREPETIT, MORRELL, CRAWFORD AND PAZON IN THEIR INDIVIDUAL CAPACITIES)

122.    Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon failed to establish and maintain policies, customs, usages, practices, and/or procedures that they knew were necessary to prevent subjecting members of the public, including Katharine Archer, to deprivation of their constitutional rights protected under the Fourth and Fourteenth Amendments.

29

123.     Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, in their roles supervising NOPD and SOD officers, failed to establish and maintain policies to ensure constitutional police conduct, and were deliberately indifferent to the deprivation of rights that resulted. Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon knew or should have known that such failures would deprive members of the public, including Katharine Archer, of their constitutional rights under the Fourth and Fourteenth Amendments.

124.     In particular, Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon failed to establish necessary policies regarding the deployment of CS gas (tear gas) which would require their supervisee officers such as Joseph, Pierce, Johnson, Jorgenson, and Harris to follow the clearly established interpretation of the Fourth and Fourteenth Amendments, including:

   a.   A bar on deploying CS gas grenades or projectiles when the level of force utilized by such deployment is unreasonable, unjustified, and disproportionate to the circumstances giving rise to the deployment;

   b.   A manner of deployment that does not expose civilians to an unreasonable, unjustified, and disproportionate risk of loss of life and/or limb.

125.     Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon also failed to establish policies to require officers of the SOD/SWAT units such as Joseph, Pierce, Johnson, Jorgenson, and Harris to follow the clearly established interpretation of the Fourth and Fourteenth Amendments that a law enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer.

30

126.    The failure to establish necessary and obvious policies by Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon resulted in the excessive use of force against Katharine Archer by their supervisee officers as well as the officers' failure to intervene. At all pertinent times herein, Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon were aware that the policies, procedures, practices, customs, and/or usages they established (or failed to establish) for NOPD would result in violations of constitutional rights. Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, ignored that risk and acted unreasonably and with deliberate indifference to Katharine Archer's constitutional rights, as described above.

127.    In the alternative, it was obvious, as a likely consequence of the failure of Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon to establish policies as set forth above, that NOPD would violate the constitutional rights of citizens such as Ms. Archer.

128.    At all pertinent times, Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford, and Pazon, were acting under color of law and in the course and scope of their employment. Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford, and Pazon acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Ms. Archer by failing to prevent the misconduct of officers under their command.

129.    As a result of the failures of the Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford, and Pazon to implement policies, customs, and practices as set forth above, Katharine Archer suffered damage and harm.

## COUNT FIVE

### *MONELL* LIABILITY FOR VIOLATION OF KATHARINE ARCHER'S CIVIL RIGHTS BASED ON THE FAILURE TO ESTABLISH POLICIES, CUSTOMS, OR PRACTICES, THAT SUBJECTED MEMBERS OF THE PUBLIC TO EXCESSIVE USES OF FORCE UNDER THE FOURTH AND FOURTEENTH AMENDMENTS, FAILURES TO TRAIN AND SUPERVISE, AND FAILURES TO INTERVENE, PURSUANT TO 42 U.S.C. § 1983

### (CITY OF NEW ORLEANS, CANTRELL, FERGUSON, THOMAS, ROBERTS, LAMPARD, PREPETIT, MORRELL, CRAWFORD, AND PAZON)

130.    The City of New Orleans violated Katharine Archer's constitutional rights when the City's final policy makers for NOPD, Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, established and maintained policies, customs, usages, practices, and/or procedures that they knew would deprive members of the public, including Katharine Archer, of the constitutional rights protected under the Fourth and Fourteenth Amendments.

131.    Further the City of New Orleans failed to establish and maintain policies to ensure constitutional police conduct, and knew or should have known that such failures would deprive members of the public, including Katharine Archer, of their constitutional rights under the Fourth and Fourteenth Amendments.

132.    In particular, the City of New Orleans failed to establish a policy, custom, or practice regarding the deployment of CS gas (tear gas) which would require officers such as Joseph, Pierce, Johnson, Jorgenson, and Harris to follow the clearly established interpretation of the Fourth and Fourteenth Amendments, including:

        a.   A bar on deploying CS gas grenades or projectiles when the level of force utilized by such deployment is unreasonable, unjustified, and disproportionate to the circumstances giving rise to the deployment;

32

      b.   A manner of deployment that does not expose civilians to an unreasonable, unjustified, and disproportionate risk of loss of life and/or limb.

133.    The City of New Orleans also failed to establish policies, customs, or practices to require officers of the SOD/SWAT units such as Joseph, Pierce, Johnson, Jorgenson, and Harris to follow the clearly established interpretation of the Fourth and Fourteenth Amendments that a law enforcement officer has a duty to intervene to prevent or stop a constitutional violation committed by another law enforcement officer.

134.    The City of New Orleans through its policies, practices, and/or customs (and the failure to establish policy) failed to train, supervise, and/or discipline NOPD officers, including Defendants Lampard, Prepetit, Crawford, Morrell, Pazon, Harris, Joseph, Pierce, Johnson, and Jorgenson to ensure that these subordinates did not violate the Fourth and Fourteenth Amendment rights of the members of the public encountered in the course of their employment by using constitutionally excessive force or failing to intervene in another's use of constitutionally excessive force. This failure to train, supervise, and/or discipline was a moving force behind the excessive use of force against Ms. Archer as well as the failure to intervene. At all pertinent times herein, the City of New Orleans was aware of the need to supervise, train, and discipline their subordinates in order to ensure that they did not violate the rights of members of the public. The City of New Orleans ignored that need and acted unreasonably and with deliberate indifference and disregard for Katharine Archer's constitutional rights, as described above.

135.    These policies, customs, usages, practices, and/or procedures (or deficits thereof) were a moving force in the excessive use of force against Katharine Archer as well as the officers' failure to intervene. At all pertinent times herein, the final policy makers for NOPD and the City of New Orleans were aware that the policies, procedures, practices, customs, and/or usages they

established (or failed to establish) for NOPD would result in violations of constitutional rights. The City's final policy makers, Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, ignored that risk and acted unreasonably and with deliberate indifference to Katharine Archer's constitutional rights, as described above.

136.    At all pertinent times, final policy makers Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, were acting under color of law and in the course and scope of their employment. Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford and Pazon, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Ms. Archer by failing to prevent the misconduct of officers under their command.

137.    As a result of the failures of the City of New Orleans to implement policies, customs, and practices as set forth above, Katharine Archer suffered damage and harm.

## COUNT SIX

**SUPPLEMENTAL STATE LAW CLAIM FOR ASSAULT AND BATTERY, OR IN THE ALTERNATIVE FOR NEGLIGENCE, RESULTING IN INJURY TO KATHARINE ARCHER**

**(CANTRELL, FERGUSON, THOMAS, ROBERTS, LAMPARD, PREPETIT, MORRELL, JOHNSON, JOSEPH, JORGENSON, PIERCE, AND HARRIS IN THEIR INDIVIDUAL CAPACITIES)**

138.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

139.    Defendants Johnson, Joseph, Jorgenson, Pierce, and Harris intended to inflict a harmful or offensive contact upon Ms. Archer in their use of excessive force against her. This use of excessive force was unjustified by legal authority. Thus, Johnson, Joseph, Jorgenson, Pierce and Harris committed the intentional torts of assault and battery.

140.    In the alternative, these Defendants are liable for the commission of negligent injury. Defendants owed a duty of care to Katharine Archer to conduct arrests and detentions and interactions with the public free from the use of excessive force. Defendants' use of tear gas munitions against Ms. Archer was an unjustified level of force that violated the duty of care owed to her and was a cause-in-fact of her injuries.

141.    Johnson, Joseph, Jorgenson, Pierce and Harris were acting under color of law and in the course and scope of their employment at all times relevant to this claim.

142.    As a direct and proximate result of these Defendants' misconduct, Ms. Archer suffered damages, including bodily injury, pain, suffering, severe mental and emotional distress, anguish, humiliation, loss of liberty, and loss of income, as set forth more fully above.

143.    Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, and Morrell are liable for the intentional torts committed by Officers Johnson, Joseph, Jorgenson, Pierce and Harris under the doctrine of respondeat superior because they maintained the employ and were responsible for the supervision of these Defendant Officers. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

144.    At all times pertinent herein, all Defendants names in this Count, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards Ms.  Archer.

## COUNT SEVEN

### SUPPLEMENTAL STATE LAW CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS RESULTING IN INJURY TO KATHARINE ARCHER

### (CANTRELL, FERGUSON, THOMAS, ROBERTS, PREPETIT, MORRELL, CRAWFORD, PAZON, JOHNSON, JOSEPH, JORGENSON, PIERCE, AND HARRIS IN THEIR INDIVIDUAL CAPACITIES)

145.    Plaintiff incorporates by reference the allegations previously set forth in this complaint.

146.    The excessive use of force by Defendants Johnson, Joseph, Jorgenson, Pierce and Harris against Katharine Archer was extreme and outrageous conduct that caused her severe emotional distress. Johnson, Joseph, Jorgenson, Pierce and Harris each knew or should have known that such distress would be the outcome of his actions and therefore is liable for the intentional infliction of emotional distress.

147.    Defendants Johnson, Joseph, Jorgenson, Pierce and Harris were acting under color of law and in the course and scope of their employment at all times relevant to this claim.

148.    As a direct and proximate result of these Defendants' misconduct, Ms. Archer suffered damages, including bodily injury, pain, suffering, severe mental and emotional distress, anguish, humiliation, loss of liberty, and loss of income, as set forth more fully above.

149.    Defendants Cantrell, Ferguson, Thomas, Lampard, Prepetit Morrell, Crawford, and Pazon are liable for the intentional torts committed by Officers Johnson, Joseph, Jorgenson, Pierce and Harris, as under the doctrine of respondeat superior because they maintained the employ and were responsible for the supervision of these Defendant Officers. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

150.     At all times pertinent herein, all Defendants named in this Count, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently toward Ms. Archer.

## COUNT EIGHT

### SUPPLEMENTAL STATE LAW CLAIMS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS RESULTING IN INJURY TO KATHARINE ARCHER

### (CANTRELL, FERGUSON, THOMAS, ROBERTS, PREPETIT, MORRELL, CRAWFORD, PAZON, JOHNSON, JOSEPH, JORGENSON, PIERCE, AND HARRIS)

151.     Plaintiff incorporates by reference the allegations previously set forth in this complaint.

152.     Defendants Johnson, Joseph, Jorgenson, Pierce and Harris owed a duty to Katharine Archer to conduct arrests, detentions, and crowd control in a reasonable manner free from the use of excessive force. By deploying tear gas munitions in the manner described in preceding sections, these officers acted excessively and breached their duty of care to Ms. Archer. This breach of care by the use of unreasonable and excessive force was both the cause-in-fact and legal cause of Ms. Archer's extensive physical injuries, emotional distress, and resulting damages.

153.     Defendants Johnson, Joseph, Jorgenson, Pierce and Harris were acting under color of law and in the course and scope of their employment at all times relevant to this claim.

154.     As a direct and proximate result of these Defendants' misconduct, Ms. Archer suffered damages, including bodily injury, pain, suffering, severe mental and emotional distress, anguish, humiliation, loss of liberty, and loss of income, as set forth more fully above.

155.     Defendants Cantrell, Ferguson, Thomas, Lampard, Prepetit, Morrell, Crawford, and Pazon are liable for the torts committed by Officers Johnson, Joseph, Jorgenson, Pierce and Harris, as under the doctrine of respondeat superior because they maintained the employ and were

responsible for the supervision of these Defendant Officers. Pursuant to Louisiana Civil Code art. 2320, "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

156.     Defendants Cantrell, Ferguson, Thomas, Lampard, Prepetit, Morrell, Crawford, and Pazon additionally owed Katharine Archer a duty to ensure that excessive force was not enacted upon her in interactions between their employees and supervisees in the course and scope of their employment. Cantrell, Ferguson, Thomas, Lampard, Prepetit, Morrell, Crawford, and Pazon had a duty to reasonably train and supervise each officer under their employ to avoid unconstitutional excessive uses of force. It was foreseeable that the failure of Ferguson, Thomas, Lampard, Prepetit, and Morrell to reasonably train and supervise their employee officers, including on the deployment of tear gas munitions would result in the commission of excessive force and injury. The failure of Cantrell, Ferguson, Thomas, Lampard, Prepetit, Morrell, Crawford, and Pazon to reasonably train and supervise their employee officers caused the officers' use of excessive force on Katharine Archer and resulted in her injuries and emotional distress.

157.     At all times pertinent herein, all Defendants named in this Count, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently toward Ms. Archer.

## JURY DEMAND

158.     Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Katharine Archer requests that this Court enter judgment against Defendants and issue the following relief:

    a.  A declaratory judgment that Defendants violated Ms. Archer's constitutional rights;

    b.  A declaratory judgment that Defendants caused the assault and battery and intentional infliction of emotional distress on Ms. Archer;

    c.  An award of damages in an amount to be determined to compensate Katharine Archer for:

        i.  Her past, present, and future physical injury, pain, and suffering;

        ii.  Her past, present, and future emotional and mental distress;

        iii.  The costs incurred by her for medical and psychological treatment, including, but not limited to, hospitalization, medical and psychological treatment, and occupational, physical, and cognitive therapy; and

        iv.  The costs reasonably anticipated to be necessary for her for future medical and psychological treatment, including, but not limited to, medical monitoring, hospitalization, medical and psychological treatment, and occupational, physical, and cognitive therapy

    d.  As available and proper, any nominal or punitive damages;

    e.  An order and judgment granting reasonable attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988; and

    f.  Any other or further relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Hannah A. Lommers-Johnson*
Hannah A. Lommers-Johnson, La. Bar No. 34944, T.A.
James W. Craig, La. Bar No. 33687
Emily M. Washington, La. Bar No. 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
Hannah.Lommersjohnson@macarthurjustice.org
jim.craig@macathurjustice.org

*Attorneys for Plaintiff Katharine Archer*