# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| REMINGTYN WILLIAMS, et al., | Civil Action No. 21-852 c/w 21-1079 |
| Plaintiffs, | SECTION "P" |
| | HON. DARREL J. PAPILLION |
| v. | MAGISTRATE "5" |
| SHAUN FERGUSON, et al., | HON. MICHAEL B. NORTH |
| Defendants. | **Applies To: 21-1079** |

## PLAINTIFF KATHARINE ARCHER'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Katharine Archer respectfully submits her opposition to the Motion for Summary Judgment[1] filed by the City of New Orleans, the New Orleans Police Department (NOPD), and individuals who are current or former employees of NOPD.[2]

Ms. Archer was severely injured on the night of June 3, 2020 when she was struck in the forehead with a CS gas grenade thrown by NOPD Special Operations Division (SOD) officers[3] into a crowd of protesters on the Crescent City Connection bridge on the orders of NOPD Command.[4] At all times that night, Ms. Archer was peacefully protesting along with her college-aged daughters in response to the killing of George Floyd.

---

[1] ECF No. 193.

[2] The individual Defendants are Shaun Ferguson, John Thomas, Lejon Roberts, Bryan Lampard, Kenny Prepetit, Todd Morrell, Michael Crawford, Dylen Pazon, Michael Pierce, Damond Harris, Devin Joseph, Jason Jorgenson, and Travis Johnson.

[3] Ex. D (NOPD FIT Report) at 4 of 305 ("Sergeant Barnes identified the following individuals as having been subject to force by NOPD officers…Katharine Archer – Was hit in the head with hand-deployed gas canister and exposed to gas.").

[4] Ex. B (Dep. of LeJon Roberts) at 378, line 22-25 – 379, line 1-11.

The protest march had been escorted by NOPD[5] and allowed to go onto the expressway after Defendants John Thomas and LeJon Roberts, the overall Incident Commander and On-Scene Incident Commander respectively, ordered NOPD officers not to prevent the protesters from marching onto the elevated highway.[6]

On June 3, 2020, after permitting the protesters to march onto the expressway, the Defendants stopped them at a "skirmish line," and ultimately used weaponry, including CS gas grenades, indiscriminately against the protesters. One such grenade, thrown into the middle of the crowd by gas team Defendants as instructed and directed by command staff Defendants, hit Ms. Archer in the forehead and knocked to her to the ground with force strong enough to break her coccyx (tailbone),[7] cause a head injury requiring 12 stitches[8] as well as speech and motor therapy,[9] and resulting in a PTSD diagnosis,[10] among other damages.

Defendants' summary judgment motion is thin. After asserting, contrary to decades of excessive force jurisprudence, that the blow to Ms. Archer's head is not a Fourth Amendment seizure, Defendants make a series of conclusory assertions without record support that the force deployed against Ms. Archer was reasonable. Despite failing to engage with any of the extensive deposition testimony of the individual Defendants, Ms. Archer, other witnesses, or with the documentary evidence, Defendants' summary judgment motion seeks to require Plaintiff to detail the facts on which a jury could reasonably rely to find liability. Plaintiff submits a detailed Statement of Material Facts along with her Statement of Contested Facts. This memorandum will

---

[5] Ex. I (Andrew Palumbo Force Statement) at 1 ("SOD Traffic officers were escorting the protestors.").
[6] Ex. A (Dep. of John Thomas) at 120, line 7-12; Ex. C (NOPD Radio Transcript) at 28, line 14-25; 29 line 9-13.
[7] Ex. R (Katharine Archer Ochsner Medical Records Excerpts) at 2735; 2741 ("Diagnosis: Closed fracture of sacrum and coccyx"); 2750.
[8] Ex. F (Dep. of Katharine Archer) at 86, line 5-10.
[9] Ex. R (Katharine Archer Ochsner Medical Records Excerpts) at 2597- 2610.
[10] Ex. F (Dep. of Katharine Archer) at 278 line 18-25 – 279 line 1-9

set forth the legal arguments demonstrating that the record in this case is beyond sufficient to require a jury trial on Ms. Archer's claims.

## I.   Legal Standard for Summary Judgment

Summary judgment is only appropriate where the moving party shows, by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that there exists "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[11] "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."[12] The court must construe the facts and evidence in the light most favorable to the non-moving party.[13] All inferences drawn from the facts and evidence must be in favor of the non-moving party, and the Court may not make credibility determinations or otherwise weigh the evidence before it.[14]

Significantly, "[t]he movant bears the initial burden and must identify those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[15] It is only after the movant has carried this burden of proof that the burden shifts to the non-movant to show that the entry of summary judgment is not appropriate.[16] Thus, "if the

---

[11] Fed R. Civ. P. 56(c)(1)(A) requires that "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."
[12] *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).
[13] *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013).
[14] *Id.*
[15] *Pioneer Exploration, L.L. C. v. Steadfast Ins. Co*., 767 F.3d 503, 511 (5th Cir. 2014).
[16] *Pioneer Exploration, L.L.C.*, 767 F.3d at 511.

moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[17]

In this case, Defendants argue that there exists no genuine dispute as to the material facts bearing on whether Ms. Archer's constitutional right to be free from excessive force under the Fourth Amendment and Fourteenth Amendment was violated. Terminally, Defendants do not offer any record evidence in support of these contentions in their brief, and make only a few assertions as to factual allegations that they leave unsupported by citation. As such, Defendants have failed in their burden as the moving party to meet their initial burden and the motion must be denied regardless of Plaintiff's response.[18] That being said, the instant memorandum in opposition presents record evidence establishing that there are material facts in dispute as to each issue raised by Defendants, even where Defendants offered no evidence to the contrary.

II.    Genuine Issues of Material Fact Exist Precluding Summary Judgment on Plaintiff's
       Fourth Amendment Excessive Force Claims.

Defendants challenge Plaintiff Archer's excessive force claims by, first, arguing that Ms. Archer was never seized when she was hit in the head and knocked to the ground by NOPD officers throwing tear gas grenades overhead into the crowd of protesters. Second, Defendants argue that the force Defendants subjected her to was reasonable under *Graham v. Connor*. Third, Defendants argue that the individually-sued Defendants are entitled to qualified immunity on the basis that there was no clearly established law putting officers on notice that their use of force against Ms. Archer violated her right to be free from excessive force. This opposition brief will address Defendants' arguments in this same order.

---

[17] *Id.*
[18] *Pioneer Exploration, L.L.C.*, 767 F.3d at 511.

A. <u>Disputed issues of material fact exist precluding summary judgment as to the question of whether Defendants seized Ms. Archer when they deployed tear gas grenades at the crowd of protesters, hitting Ms. Archer and demobilizing her.</u>

Defendants' argument that Ms. Archer was not "seized" when hit on the head by a CS gas grenade would, if accepted, overrule virtually all excessive force jurisprudence. The Supreme Court has set out the well-established rule for what constitutes a seizure: "our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment [is] meaningful interference, however brief, with an individual's freedom of movement."[19]

This clear definition of seizure applies without question to the actions of NOPD officers who deployed tear gas grenades at the crowd of protesters, hitting Ms. Archer in the head, opening a gash necessitating 12 stitches, and knocking her to the ground, breaking her tailbone, before releasing a cloud of tear gas into her face. Ms. Archer's freedom of movement was terminated by NOPD's grenade deployment for the period of time that she was knocked to the pavement and immobilized by pain and smoke. The interference with Ms. Archer's freedom of movement achieved by NOPD's deployment of tear gas grenades into the crowd of protesters and onto her body plainly satisfies the Supreme Court's definition.

Over decades, the Supreme Court has denied attempts to narrow the definition of seizure under the Fourth Amendment. The Court has clarified that seizure does not require that the officer use overt physical force to restrict an individual's movement: "An officer seizes a person when he, 'by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen.'"[20]

---

[19] *U.S. v. Jacobsen*, 466 U.S. 109, 114 n. 5 (1984).
[20] *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968) (emphasis in original).

Where an officer has used physical force to interfere with an individual's freedom of movement, the Supreme Court and Fifth Circuit have both additionally clarified that, whether the individual is cognizant of the use of force in the moment, and whether the individual's movement was curtailed in the exact manner the officer hoped is immaterial—what matters is that the officer did interfere with the individual's freedom of movement by using the means intended to do so.[21]

Thus, in *Brower v. Inyo Cnty.*, the Supreme Court examined the case of a roadblock erected by law enforcement in order to restrain a subject from continuing forward on his path of flight, which the subject crashed into and died.[22] The Ninth Circuit had found that no seizure had occurred given that law enforcement had not restrained the subject's movement or his ability to drive away until his failure to come to a voluntary stop at the roadblock resulted in a crash.[23] The Supreme Court reversed, ruling that a seizure has occurred where officers take action to restrain a subject's freedom of movement, which results in the intended restraint on their freedom of movement, even if not in the exact manner planned.[24] The Court held that it did not matter whether officers had hoped the roadblock would restrain movement by inducing the subject to voluntarily stop driving forward, rather than producing a crash. What mattered was that his movement was restrained by the means (the roadblock) intentionally utilized for this purpose.[25]

Similarly, in *Flores v. City of Palacios*, the defendant officer argued that no seizure had occurred when he shot at Flores' car because his shot only hit the car bumper,[26] and because he

---

[21] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598 (1989); *Flores v. City of Palacios*, 381 F.3d 391, 396-7 (5th Cir. 2004).

[22] *Id.* at 594.

[23] *Brower v. Inyo Cnty.*, 817 F.2d 540, 546 (9th Cir. 1987).

[24] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598 (1989).

[25] "It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989).

[26] *Id.* at 394.

contended that Flores never realized that the impact she felt and heard was his shot.[27] The Fifth

Circuit disagreed, explaining that where physical force is exerted by an officer to restrain an

individual's movement, and does restrain her movement, that constitutes a seizure regardless of

how exactly the officer's force accomplished his goal or whether she was cognizant of it.[28] Quoting

the Supreme Court's *Brower* analysis., the Fifth Circuit explained:

> In determining whether the means that terminates the freedom of
> movement is the very means that the government intended we
> cannot draw too fine a line, or we will be driven to saying that
> one is not seized who has been stopped by the accidental
> discharge of a gun with which he was meant only to be
> bludgeoned, or by a bullet in the heart that was meant only for the
> leg. We think it enough for a seizure that a person be stopped by
> the very instrumentality set in motion or put in place in order to
> achieve that result.[29]

The Fifth Circuit held Flores had been seized where the officer's shot hit her car's bumper

and caused her to stop driving because "the termination of her freedom of movement was

accomplished by exactly the means intentionally applied, i.e., the shot to her car."[30]

The physical force NOPD used against Ms. Archer is the same: while NOPD officers and

command staff may have hoped that their deployment of tear gas grenades would stop the crowd

of protesters from continuing forward through the police line and across the bridge due the pain

and temporary blindness caused by CS gas exposure, the exact means intended to restrain the

protesters movement—deployment of tear gas grenades at the crowd—did restrain Ms. Archer's

movement when the grenade hit her in the forehead, knocking her to the ground and causing her

tailbone to break. "[T]he termination of her freedom of movement was accomplished by exactly

---

[27] *Id.* at 396.
[28] *Id.* at 396-7.
[29] *Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004) (quoting *Brower* at 598–99).
[30] *Id.* at 396-7.

the means intentionally applied . . . " i.e., the deployment of tear gas grenades at the crowd of protesters.[31]

More recently, in *Torres v. Madrid*, the Court rejected the argument by defendant officers that the plaintiff in that case had not been seized when they shot her because she hadn't been restrained from her freedom of movement—she continued driving.[32] Significantly, the Supreme Court set out that there is no requirement under the Fourth Amendment that the force exerted by an officer successfully restrain an individual's freedom of movement in order to constitute a seizure. Rather, where an officer's application of physical force to a person objectively manifests an intent to restrain movement, that constitutes a seizure even where the individual is not actually restrained from continuing her path. [33] The Court cited the longstanding "rule that the touching constitutes an arrest"[34] and held that, despite the fact that she continued driving, "officers seized Torres by shooting her with intent to restrain her movement"[35] and that officers had seized her "for the instant that the bullets struck her."[36]

Likewise, NOPD's deployment of tear gas grenades at protesters when the police skirmish line broke down objectively manifested an intent to restrain protesters from moving forward through the police line. As with Ms. Torres, it is immaterial whether Ms. Archer was only temporarily immobilized by the force of the grenade hitting her, because NOPD's deployment of tear gas grenades manifested an objective intent to restrain protesters, including Ms. Archer, from moving forward through the collapsed police line and across the bridge.

---

[31] *Id.* at 396-7.
[32] *Torres v. Madrid*, 592 U.S. 306, 311 (2021) ("The question before us is whether the application of physical force is a seizure if the force, despite hitting its target, fails to stop the person.").
[33] *Id*. at 325.
[34] *Torres v. Madrid*, 592 U.S. 306, 324 (2021).
[35] *Torres v. Madrid*, 592 U.S. 306, 325 (2021).
[36] *Torres v. Madrid*, 592 U.S. 306, 318 (2021).

Without citation to any facts in evidence, Defendants assert that NOPD deployed tear gas grenades with "one intent, to move the crowd back to the on-ramp" forcing them to exit, which Defendants contend is not an intent to restrain movement because "the crowd was always able to leave."[37] In support of this proposition, Defendants cite only *Torres*.[38] This misunderstands the contours of Fourth Amendment seizure under *Torres* and its predecessors.

First, as *Torres* made clear, it is immaterial to the question of seizure whether the individual struck by the officers' application of force to her body was able to leave, or did ultimately leave. Rather, where the force used manifested an intent to restrain the individual's freedom of movement, a seizure has occurred. Likewise, NOPD's deployment of tear gas grenades onto the crowd objectively manifested an intent to interfere with the protesters' freedom of movement, restraining them from continuing the path of the march forward across the bridge, and physically pushing them backward. Ms. Archer was herself knocked to the ground and temporarily immobilized when she was hit with NOPD's tear gas grenade.

Second, the Supreme Court has also made clear that whether a seizure by physical force has occurred does not depend on whether officers intended to restrain an individual's movement in one particular direction. Defendants seek to disclaim that they seized Ms. Archer when they hit her with a tear gas grenade, knocking her to the ground, by characterizing their intent in deploying tear gas grenades as intent to push protesters backwards towards the onramp rather than intent to restrain protesters from moving forward or away.

However, such directional semantics are meaningless when it is clear that Defendants' deployment of tear gas grenades at protesters manifested a clear intent to restrain their freedom of movement. Thus, the protesters could not move forward without being hit with gas, could not stay

---

[37] Defendants' Memorandum in Support of Motion for Summary Judgment (ECF 193-1) at 3.
[38] Defendants' Memorandum in Support of Motion for Summary Judgment (ECF 193-1) at 2-3.

on the bridge without being hit with gas, and could only move in one direction to escape the deployment of force. The Supreme Court has made clear that a seizure has occurred where officers exert physical force to try to restrain an individual's freedom of movement to drive away (*Torres*), as well as where officers exert physical force in the form of a roadblock to restrain an individual from continuing their path forward on a highway (*Brower*). There is no directional requirement; seizure has occurred where officers' application of force has manifested "intent to restrain her movement."[39]

There is ample evidence that Defendants' primary aim in engaging with the protesters on June 3, 2020 was to stop the path of movement forward by protesters across the bridge. NOPD Command ordered officers to form a skirmish line at the top of the bridge with the stated aim of stopping protesters from marching across the bridge.[40] NOPD On-scene Incident Commander Roberts testified that when the protest march approached the area nearby onramps to the interstate, it was on his order that officers set up a skirmish line of officers on top of the interstate at the Crescent City Connection bridge in order to "prevent them from going across."[41]

Captain Roberts announced to officers over the NOPD radio that protesters should be allowed onto the "interstate"[42] and then contained and stopped from going further once on the interstate: "Just be advised everybody, if they do go on the interstate, we want to be able to contain

---

[39] *Torres v. Madrid*, 592 U.S. 306, 325 (2021).
[40] Ex. A (Dep. of John Thomas) at 111 lines 19-24: "Once they -- the protesters got up to the top of the bridge and they were trying to cross the bridge, I was notified that they were creating a barrier so they couldn't cross the bridge. And then SOD was dispatched as a backup to the officers that was creating a line for them not to cross the bridge."
[41] Ex. B (Dep. of LeJon Roberts) at 327 lines 4-21: "Q …did you order officers to position themselves there on the top of the Crescent City Connection Bridge? A. I knew they were headed toward the GNO, the Greater New Orleans Bridge. ... And when they got in close proximity of that, I put officers up on top of the bridge because I was anticipating that they were going to take the bridge at ramps, on-ramp or of-ramp, to try to get up on those bridges at some point in time during the night. So I had officers up there already placed on top, so that if they did <u>we could prevent them from going across.</u>"
[42] In this context, the "interstate" is a reference to the Ponchartrain Expressway to the immediate east of the Crescent City Connection bridge.

them on the interstate from both ends. We don't want to try to prevent them from going up there."[43] Captain Roberts later repeated, "Remember, guys, we don't want to prevent them. We want to contain them up there. We want to be able to contain them and prevent them from going further on either side."[44] NOPD directed its officers to "contain" protesters and to form a skirmish line at the bridge to "prevent them from going across."

Further, Defendants Thomas, Roberts, and Lampard, acting under the authority given to them by Defendant Ferguson, ordered the deployment of gas munitions to stop protesters from proceeding forward across the bridge when the skirmish line broke down. Defendant Lampard's Officer Force Statement described his decision to order the deployment of gas grenades as a response to the skirmish line being breached by protesters: "[protesters] began calling for the group to break through the police skirmish line . . . . As he observed the line being breached, Captain Lampard gave the order to deploy gas by the command Gas, Gas, Gas."[45]

Sgt. David Barnes, who led the NOPD investigation into the force used at the June 3, 2020 protest, was the 30(b)(6) designee of NOPD and the City. Barnes testified that the preparation for gas deployment and the decision to deploy gas grenades was made by NOPD Command officers due to the skirmish line failing to hold protesters from crossing the bridge: "[Captain Lampard] and Captain Roberts made the decision to prepare in the event the skirmish line broke down. And then when the skirmish line broke and essentially did not exist anymore, the order to deploy gas was given."[46] Sgt. Barnes stated in his summary of investigation findings that "The response of officers, after physically **trying to prevent the protesters from advancing**, included pushing

---

[43] Ex. B (Dep. of LeJon Roberts) at 333 lines 4-9.
[44] Ex. A (Dep. of Deputy John Thomas) at 120, lines 7-12; Ex. C (NOPD Radio Transcript) at 29, lines 9-13; Ex. B (Dep. of LeJon Roberts) at 341, lines 23-25 – 342 lines 1-2.
[45] Ex. D (Excerpts from NOPD's Force Investigation Report ("NOPD FIT Report")) at 69-70 of 305.
[46] Ex. E (30(b)(6) Dep. of David Barnes Vol. I) at 100, lines 8-15.

back, shoving with shields, jabbing with batons, and ultimately deploying CS gas and 40mm impact rounds."[47] Defendants' argument that their deployment of tear gas grenades at protesters did not manifest an intent to restrain protesters' freedom of movement on the bridge is without merit.

Ms. Archer herself was temporarily immobilized and restrained from any movement when one of the tear gas grenades thrown into the crowd hit her in the head, splitting her forehead open, and knocking her to the pavement, breaking her tailbone. NOPD's deployment of tear gas grenades at the crowd of protesters was an immediate response to their skirmish line failing to restrain protesters from marching forward. NOPD's deployment of the tear gas grenade which struck Ms. Archer was intended to restrain protesters from moving through the failed police line and across the bridge, and constituted "meaningful interference, however brief, with an individual's freedom of movement."[48]

B. Defendants are not entitled to qualified immunity because under clearly established law in existence on June 3, 2020 there is a genuine dispute of material fact as to whether Defendants' use of force against Ms. Archer was unreasonable.

A plaintiff proves her claim of excessive force where she demonstrates that seizure by law enforcement produced: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[49] There is no dispute that Ms. Archer suffered serious injuries that still impact her,[50] and that her

---

[47] Ex. D (Excerpts from NOPD FIT Report) at 302 of 305.

[48] *U.S. v. Jacobsen*, 104 S.Ct. 1652, 1656, 466 U.S. 109, 114 n. 5 (1984).

[49] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005)); *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman*, 483 F.3d at 416).

[50] Ms. Archer's injuries range from the gash on her head that required 12 stitches, to a broken tailbone (coccyx), to diagnoses including cognitive communication deficits and PTSD. See, e.g., Ex. R (Katharine Archer Ochsner Medical Records Excerpted) 2774-5; Ex. F (Dep. of Katharine Archer) at 84, line 5-10 ("Q. And this being struck in the head, what happened after you were struck in the head? I want you to tell me. A.  It opened my head. … And I needed 12 stitches."); 151 line 7-11 ("My coccyx is no longer broken but as I sit here today, I am fully aware that my coccyx is uncomfortable even though I'm on a specific cushion to help with that discomfort.  And often, my coccyx hurts when I walk."); 278 line 18-25 – 279 line 1-9; 279 line 14-25 – 280 line 1-10.

injuries resulted from Defendants hitting her in the head with a tear gas grenade.[51] Defendants only challenge the third element of Ms. Archer's excessive force claim, arguing that the force used against her was reasonable, and that no clearly established law at the time would have put officers on notice otherwise. They are wrong.

Under clearly established law, a particular use of force is excessive in violation of the Fourth Amendment if it is not justified by factors set out by the Supreme Court in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight."[52] "'[I]n an obvious case,' the *Graham* excessive-force factors themselves 'can clearly establish the answer, even without a body of relevant case law.'"[53]

The objective assessment of whether a reasonable officer would have perceived a reasonable threat that justified that particular level of force is necessarily a fact-bound analysis that the Fifth Circuit has long recognized as generally only resolvable before the fact finder. "Our standard of review . . . namely, whether a reasonable jury could enter a verdict for the non-moving party—emphasizes the importance of juries in cases of alleged excessive force . . . in those cases where the officer's conduct is less clear and an assessment of reasonableness mandates a number of factual inferences, the case falls within the province of a jury."[54]

The Fifth Circuit has consistently applied the *Graham* factors for decades, making clear that where an individual has committed only a minor offense, does not pose a threat to officers,

---

[51] Ex. D (Excerpts from NOPD FIT Report) at 4 of 305 ("Sergeant Barnes identified the following individuals as having been subject to force by NOPD officers in the listed ways: … Katharine Archer – Was hit in the head with hand-deployed gas canister and exposed to gas.").

[52] *Graham v. Connor*, 490 U.S. at 396.

[53] *Cooper* at 524 (quoting *Newman* at 764) (finding that the plaintiff's right was clearly established to be free from the level of force applied in this case via a dog bite because the jurisprudence set out that the level of force any officer may employee is reduced where an individual is not resisting arrest, regardless of the fact that those prior cases did not deal with dog bites, specifically).

[54] *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).

and does not attempt to resist arrest or flee, officers are on notice that it is unreasonable to wield direct force even in the form of a "less lethal" munition against them, such as shocking with a taser and deploying pepper spray, or striking with a police baton.[55] The Fifth Circuit has made clear that there need not be law specific to the munition utilized for an officer to be on notice that their use of force is objectively unreasonable: "Lawfulness of force does not depend on the precise instrument used to apply it. Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel."[56]

Before June 3, 2020, it was clearly established in the Fifth Circuit that an officer must use a reduced level of force on a suspect whose "behavior did not rise to the level of active resistance."[57] In *Darden v. City of Fort Worth*, the Fifth Circuit held that clearly established law applicable in 2013 put officers on notice that where an individual is not exhibiting active resistance, the level of force used may not include forcing the subject to the ground and shocking them with a taser.[58] *Darden* denied qualified immunity to the officer in that case, holding that "Our case law

---

[55] *Autin v. City of Baytown*, 174 F. App'x 183, 185–86 (5th Cir. 2005) (affirming denial of qualified immunity where the officer tased a plaintiff despite the fact that plaintiff was, at most, committing the minor crime of criminal mischief, was not a threat to anyone, and was not resisting arrest); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012) (finding officers' force in striking plaintiff with a baton objectively unreasonable where the plaintiff was pulled over for a minor traffic stop, did not attempt to flee, and did not pose a serious threat); *Massey v. Wharton*, 477 F. App'x 256, 263 (5th Cir. 2012) (affirming denial of qualified immunity to officer who tased a plaintiff twice and pepper sprayed him, even though the plaintiff was not a threat, was not attempting to flee, and was obeying officer's commands).

[56] *Newman v. Guedry*, 703 F.3d 757, 763–64 (5th Cir. 2012) (denying qualified immunity to where officers who tased a subject argued that there was no clearly established law that outlined the appropriate use of tasers, and holding that officers were on notice that their use of force was unreasonable regardless of the munition because none of the *Graham* factors were present). That is a concrete example of the principle that "[t]he law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016) (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)). See also *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[57] *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).

[58] *Id.*

makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced."[59]

The Fifth Circuit in *Darden* inventoried its clearly established law as to whether intermediate force is reasonable where a subject has not resisted arrest, including *Cooper*,[60] *Newman*—where the court held that force had been clearly established as unreasonable given that none of the *Graham* factors were present regardless of whether there was prior jurisprudence specifically referencing Tasers,[61] *Bush v. Strain*[62] and *Graham*.[63] The Fifth Circuit determined that its jurisprudence clearly placed officers on notice as of 2013 that where no active resistance is present, direct force including striking the face or body of an individual is unreasonable.[64] The Fifth Circuit's 2018 summation of the clearly established law in *Darden* controls here, where Ms. Archer was subjected to serious force in the form of a strike to the head with a tear gas grenade that knocked her to the ground, then emitted tear gas in her face, despite the fact that Ms. Archer had not having actively—or even passively—resisted officers.

As in *Newman*, the record evidence here supports the material consideration that none of the *Graham* factors are present in this case, making it clear that painful bodily force was objectively unreasonable no matter the munition used to deliver it: Ms. Archer was not committing a crime of any severity and evidence exists that she did not commit any violation at all, Ms. Archer

---

[59] *Id.*

[60] *Cooper* at 524.

[61] *Newman* at 763.

[62] *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (denying qualified immunity to an officer who slammed subject's face despite the fact that she was not resisting).

[63] *Darden* at 731.

[64] *Id.* ("Similarly, in *Newman* we found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's 'behavior did not rise to the level of active resistance.' … [W]e held in *Bush* that it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.'")

posed no immediate threat to anyone's safety, and Ms. Archer did not actively resist arrest or attempt to evade arrest.[65]

> a. *Ms. Archer was not committing a crime of any severity.*

Though Defendants wish to characterize the protesters presence on the highway as illegal, representing a misdemeanor criminal violation for *Graham* consideration, there is significant evidence to the contrary.

Ms. Archer was not charged with any crime. The severity of any uncharged conduct by Ms. Archer could at most be said to have been obstruction of a public highway, a misdemeanor offense, for simply being present in the roadway.[66] However, at the time that Ms. Archer entered the expressway with the protest marchers, NOPD had already blocked off the highway to vehicular traffic.[67] That meant that Ms. Archer's presence on the highway was not serving to "render movement thereon more difficult" as required to meet the elements of the misdemeanor offense of La. R.S. 14:97 Obstruction of a Public Highway, because NOPD had already chosen to terminate all vehicular movement on the highway.

Indeed, NOPD had been actively escorting the protest march through the city on June 3, 2020, giving no indicating that protesters were participating in an illicit march, or that it was a violation for them to march in the roadway.[68] NOPD tracked the path of the protest march, and Captain Lampard or Lieutenant Prepetit dispatched "motorcycles that would go in front of the

---

[65] *Graham v. Connor*, 490 U.S. at 396. (The totality of the circumstances that should be consulted include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.").

[66] La. R.S. 14:97. There is no allegation or evidence in this case that Ms. Archer ever committed any type of crime including pushing. She was not able to see to the front of the crowd of protesters, and she never saw any protester engaging in pushing or any violence whatsoever. Ex. F (Dep. of Katharine Archer) at 82, line 3-10; 126, line 3-17.

[67] Ex. G (30(b)(6) Dep. of David Barnes, Vol. II) at 20, lines 12-14 ("A decision was made to block traffic on the bridge in the event that the protesters went onto the bridge.").

[68] Ex. I (Andrew Palumbo Force Statement) at 1 ("SOD Traffic officers were escorting the protestors.").

protest in order to block traffic,"[69] signaling that protesters were not only allowed to march in the street, but were being actively assisted in doing so by the NOPD. The following day, NOPD's Facebook account posted a picture of its motorcycles blocking traffic for the protest, saying: "The #NOPD continues to support protesters as they exercise their right to freedom of speech. We are blocking traffic as protesters march through the city. Again, let's remain peaceful as we honor the memory of #georgefloyd."[70] NOPD clearly indicated that it had been and was continuing to assist and escort protesters marching through city streets.

After being escorted by NOPD motorcycles that drove ahead of protesters and blocked traffic for them, when protesters approached the onramp to the highway, there was no announcement to protesters that anything had changed and that they were suddenly not permitted to continue the march.[71] Officers on protest duty were explicitly told not to prevent protesters from going onto the highway by NOPD Incident Command over the NOPD radio: "We don't want to try to prevent them from going up there."[72] . . . "Remember, guys, we don't want to prevent them."[73] And once protesters made it onto the highway and arrived at the NOPD skirmish line, stopping them from marching for the first time, "NOPD advised they could stay on the expressway for a while to protest."[74]

---

[69] Ex. H (Dep. of Todd Morrell) at 121, line 22-25 – 122, line 1-9 ("…when you start matching in the street, it's more of a protest. Now, once the -- the protest started, which, you know, they have every right to protest, the other thing I would do is, when I provided the amount of people and the location that we were heading -- I would provide that to either Captain Lampard or Lieutenant Prepetit, they had motorcycles that would go in front of the protest in order to block traffic so that they could, you know, go down the street without running into traffic.").
[70] Ex. Z (NOPD Facebook Post).
[71] Ex. F (Dep. of Katharine Archer) at 74, line 7-15 ("Q. Okay. At the time you entered, you were going on the on ramp, were police present on the on ramp? A. Not that I saw. Q. You didn't see any police cars on the on ramp? A. No. Q. No officers out there? A. No.").
[72] Ex. B (Dep. of LeJon Roberts) at 333, line 4-9.
[73] Ex. A (Dep. of John Thomas) at 120, line 7-12; Ex. C (NOPD Radio Transcript) at 29 line 9-13; Ex. B (Dep. of LeJon Roberts) at 341 lines 23-25 – 342 line 1-2.
[74] Ex. I (Andrew Palumbo Officer Force Statement) at 1 ("The protesters wanted to continue across the bridge and NOPD advised they could stay on the expressway for a while to protest but would have to exit the elevated expressway at the same ramp they entered.").

Defendants conceded in NOPD's 30(b)(6) designee's testimony that protesters could have perceived closure of traffic on the interstate by NOPD as an indication that entry onto the highway was permitted.[75] Sergeant Barnes, the 30(b)(6) designee, also concluded in the Tactical Analysis portion of the NOPD FIT Report, "NOPD's decision to detour traffic on the highway, [left] an open pedestrian mall-like atmosphere for protesters . . . . **This action signaled to protesters that NOPD was allowing them to enter the highway** and that NOPD would be escorting and providing for their safety on the bridge."[76]

Where the police have signaled by closing down traffic and escorting a protest march that protesters are permitted to march in the roadway, and where police have explicitly communicated that protesters are allowed to stay on the expressway to protest, there can be no crime in abiding by that direction.

When arguing that Defendants' conduct was objectively reasonable, Defendants additionally make the assertion that there is "law of the case" that protesters were found by the Fifth Circuit to not be participating in a constitutionally protected activity. Defendants rely on the Fifth Circuit's unreported opinion in *Williams v. Davis*,[77] an appellate decision to which neither Ms. Archer nor the City of New Orleans was a party, arising from the separate action, *Williams v. Ferguson*, in which a Motion to Dismiss was filed by the Superintendent for the Louisiana State Police, who was a defendant in that case only.[78] "It is a fundamental principle of American jurisprudence that a person cannot be bound by a judgment in litigation to which he was not a

---

[75] Ex. G (30(b)(6) Dep. of David Barnes, Vol. II) at 21, line 20-25 ("Q. And am I correct that as a result of the blocking of traffic, the department understood that the protesters could have received that shutting down of traffic as an indication that entry of the highway was permitted? A. Yes.").

[76] Ex. D (Excerpts from NOPD FIT Report) at 288 of 305. (Emphasis added.)

[77] *Williams v. Davis*, 2023 WL 119452, at *1 (5th Cir. 2023) (unreported) ("On behalf of a putative class, three of those protestors now seek to maintain a suit against the superintendent of the Louisiana State Police ("LSP"), whose troopers were allegedly 'bystanders' at the event.").

[78] *Id.* at *7 (holding that the class of plaintiffs in that action against the LSP did not have standing and had not met the *Ex parte Young*, 209 U.S. 123 (1908) standard for suits against a state).

party."[79] Law of the case doctrine does not apply unless the matter has been litigated within the same case, made up of the same parties.[80] As Wright and Miller explain: "Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. **They do not apply between separate actions, even if they are related**."[81]

The Fifth Circuit has held that not even co-defendants, tried and convicted in the same case, are bound by courts' findings as to each other's 2255 motions.[82] Simply put, "[n]othing about the law-of-the-case doctrine suggests that it can apply across cases to bind new parties, when generally not even res judicata—the doctrine actually charged to determine the preclusive effects of judgments—can do that."[83]

Here, the class action suit filed in *Williams v. Ferguson* was consolidated with the instant case "for discovery purposes only."[84] However, consolidated cases do not become the same case.[85] The Supreme Court has long held that "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."[86]

---

[79] *Meza v. General Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990).

[80] *Arizona v. California*, 1460 U.S. 605, 618 (1983) ("[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages **in the same case**.") (emphasis added); *F.D.I.C. v. McFarland*, 243 F.3d 876, 884 (5th Cir. 2001) (discussing that proceedings must constitute the "same case" including having the same case number and facts presented for law of the case doctrine to apply); *United States v. Lawrence*, 179 F.3d 343, 351 (5th Cir. 1999) (holding that law of the case doctrine does not bind one co-defendant to rulings in the separate appellate action of their former co-defendant despite them having been tried together); *Morris v. SWDI, LLC*, 872 F.Supp.2d 499, 507 (E.D. La. 2012) (holding that law of the case does not apply because it "is *not* the same case—it is only a related case" where the new complaint plaintiffs filed following dismissal without prejudice added an allegation as to the defendant's citizenship for diversity jurisdiction purposes).

[81] Charles Alan Wright & Arthur R. Miller, § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (3d ed.) Westlaw (database updated 2024).

[82] *United States v. Lawrence*, 179 F.3d at 351 ("Although Lawrence was tried jointly with Tolliver, the doctrine of the law of the case does not govern his claim.").

[83] *Edmonds v. Smith*, 922 F.3d 737, 740 (6th Cir. 2019).

[84] ECF No. 33 Order "granting the motion for consolidation for discovery purposes only (R. Doc. 31) filed by City Defendants."

[85] *Johnson v. Manhattan Ry.*, 289 U.S. 479, 496–97 (1933).

[86] *Id.*

Ms. Archer would not have been permitted to participate in the Fifth Circuit appeal taken by Col. Lamar Davis of the Louisiana State Police—who is not a defendant in Ms. Archer's case—from the Motion to Dismiss ruling filed only in *Williams v. Ferguson*. She cannot be bound by law of the case where she had no input in that appeal. Moreover, the Fifth Circuit was not privy to the evidence produced in discovery since that decision. The Fifth Circuit's decision in *Williams v. Ferguson* does not create law of the case as to Ms. Archer's separate suit against the City of New Orleans, et al.

In short, a reasonable jury could find from the record evidence that Ms. Archer committed no violation whatsoever by participating in the march and protesting on the interstate on June 3, 2020, and at most committed a minor misdemeanor offense of obstructing a public highway, making Defendants' use of force hitting Ms. Archer in the head with a tear gas grenade unreasonable under *Graham*.

   b.   *Ms. Archer did not pose an immediate threat to anyone.*

There is no evidence supporting that Ms. Archer was posing an immediate threat, or any threat, to anyone—police officer or otherwise. Defendants have made no allegation nor provided any evidence that any threat was posed by Ms. Archer. Under *Graham*, where a person has not posed any level of immediate threat, the use of force against them is unreasonable.

While Defendants allege without citation that members of the crowd at the very front at the skirmish line were using physical force to try to push past police officers, those allegations are unique to a small number of individuals at the very front of the crowd.[87] It is undisputed that Ms.

---

[87] Ex. O (Dep. of Kenny Prepetit) at 354, line 19-25 – 355, line 1-9; Ex. D (Excerpts from NOPD FIT Report) at 16 of 305.

Archer was not at the front of the crowd of protesters.[88] Ms. Archer testified that she never saw any protester engaging in violence, including pushing.[89]

### c.  Ms. Archer was not resisting or evading arrest.

There is similarly no evidence supporting the final *Graham* factor, that Ms. Archer was attempting to resist or evade arrest when NOPD hit her with a tear gas grenade. On the contrary, she was standing in the middle of a group of protesters with her daughters[90] after having been allowed to be present on the expressway by NOPD.[91]

### d.  All Graham factors weigh in Ms. Archer's favor.

Where, as here, not a single *Graham* factor is present with regard to Ms. Archer, use of physical force against her is unreasonable and excessive.[92] The Fifth Circuit has held that as early as 2013 (if not 2009), "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation."[93] Ms. Archer

---

[88] Ex. F (Dep. of Katharine Archer) at 179, line 8-16: "Q….you were back in the crowd and I understand that you couldn't see everything that was going on out in the crowd but let me ask you this question. Was everybody in the crowd peaceful? A. I think so. Q. So no one was acting antagonistically towards the police? A. I don't think so."

[89] Ex. F (Dep. of Katharine Archer) at 82, line 16-19: "Did you ever see anybody engage in any acts of violence towards the police department? A. No."; 126, line 9-17: "Q.  Okay.  So if you couldn't see what was happening in the front, then you couldn't see if other protestors were pushing the police.  Isn't that correct?  Well, if you couldn't see, you couldn't see.  Isn't that correct, Ms. Archer? A. Yes."

[90] Ex. F (Dep. of Katharine Archer) at 82, line 4-10.

[91] Ex. I (Andrew Palumbo Officer Force Statement) at 1 ("… NOPD advised they could stay on the expressway for a while to protest but would have to exit the elevated expressway at the same ramp they entered.").

[92] *See, e.g.*, *Newman*, 703 F.3d at 763–64 (5th Cir. 2012) discussed *supra*.

[93] *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (citing *Deville v. Marcantel*, 567 F.3d 156, 167–69 (5th Cir. 2009) ("finding qualified immunity inappropriate where, taking the facts in the light most favorable to the plaintiff, an officer making a minor traffic stop overpowered an individual who displayed, at most, passive resistance, and presented no safety threat or flight risk"); *Doss v. Helpenstell*, 626 F. App'x. 453, 459–60 (5th Cir. 2015) (unpublished) ("construing *Deville* as clearly establishing that an officer should receive no qualified immunity if he 'quickly escalate[s]' an encounter with a non-threatening, passively-resisting driver who posed little risk of escape by employing overwhelming force 'rather than continu[ing] to negotiate'"); *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016) ("In denying qualified immunity, we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force.")).

at most could be said to have committed the misdemeanor offense of obstruction of a public highway, she posed no immediate threat or flight risk, and engaged in no resistance.

Defendants attempt to shift the focus away from Ms. Archer, arguing that it was "objectively reasonable" to use munitions to disperse a crowd where some protesters at the front of the crowd allegedly engaged in pushing, attempting to get past the line of officers.[94] While the totality of the circumstances must be considered, *Graham* and its progeny does not allow for an officer's use of force against one individual to be justified by the commission of a crime or the resistance of another. Even taking as true the unsupported allegation by Defendants that some number of protesters at the front of the crowd had committed a crime or posed a threat by trying to push past the officers in the line and cross the bridge, such a threat would only justify a use of force against those protesters, not a use of force against peaceful protesters standing and waiting in the middle of the crowd.

Defendants also seek to recast their deployment as simply a release of gas against the crowd. Regardless of whether it would have been reasonable to expose all protesters to the CS gas itself—either by rolling grenades on the ground into crowd, or releasing gas at the skirmish line to so that it would blow into the crowd—that is not what Defendants did. Rather, Defendants planned and instructed the SOD gas team, prior to even arriving at the protest, to deploy tear gas grenades in a manner where the grenades would foreseeably hit protesters—and would hit protesters who were not located at the front of the crowd.

At the pre-operation briefing that occurred prior to SOD officers being dispatched to the protest, SOD supervisors Sergeant Harris and Lt. Prepetit specifically ordered the deployment of

---

[94] Defendants' Memorandum in Support of Motion for Summary Judgment (ECF 193-1) at 8.

tear gas grenades "overhand, 10-15 feet into the crowd."[95] And when the order to deploy was given at the protest, officers obeyed this instruction.[96] Defendant Jorgenson attested, "at the protest I deployed the canisters in the manner in which I was instructed to deploy them (overhead lob, five to ten feet into the crowd of protesters)."[97] Jorgenson further described his tear gas grenade deployment as "a hook shot motion."[98] Other testimony of officers at the protest confirms that tear gas grenades were deployed as instructed in the pre-operation briefing, describing seeing the gas munitions "flying overhead"[99] at a height of "fifteen, 20 feet maybe."[100]

      The design of this deployment into the crowd made it a near-certainty that tear gas grenades would directly hit protesters, not simply release gas. Defendant Jorgenson testified that it was "definitely possible" that one of the gas grenades he deployed hit a protester,[101] and stated that was because of the method by which he deployed—"deploying a gas canister into a crowd of hundreds, if not thousands of people, 10 to 15 feet into the center of the crowd would definitely make it possible that it could strike a person."[102]

      Further, NOPD's decision to deploy force in that manner cannot be defended as a use of force taken in the heat of the moment by an officer having to make a split-second decision, because

---

[95] Ex. D (Excerpts from NOPD FIT Report) at 155 of 305 ("Sergeant Barnes clarified with Officer Jorgenson that the instruction he received on how to deploy the canisters came in the pre-operation briefing by his supervisors, specifically Sergeant Harris and Lieutenant Prepetit . . . The supervisors instructed him on how to deploy the gas canisters over the police line, throwing them overhand 10-15 feet into the crowd.").

[96] SOD Officer Travis Johnson was one of two officers on the bridge who admitted to during the FIT Investigation to deploying tear gas grenades. He testified to deploying multiple tear gas grenades, one dropped at the skirmish line, one tossed approximately 10 feet into the crowd of protesters using a "soft ball" "soft toss," and one tossed overhead in the direction of protesters. Ex. J (Dep. of Travis Johnson) at 109, line 25 – 110 line 1-4 ("Q. And when you say "a toss in front of the line," can you describe what that motion was? A. Do you know anything about softball? Q. Yes. A. A soft toss."); 115 lines 8-10 ("That one was deployed overhand toss, back towards the direction of where the protesters were, Yes, ma'am.").

[97] Ex. K (Jason Jorgenson Force Statement) at 1.

[98] Ex. L (Dep. of Jason Jorgenson) at 78, line 15.

[99] Ex. M (Dep. of Bryan Bissell), at 54 line 18-20 ("Q. When was the first time that you 19 realized that gas munitions had been deployed? 20 A. When I saw them flying overhead.").

[100] Ex. M (Dep. of Bryan Bissell) at 64 line 24-25–65 line 1-2 (" Q. And I know you described it as flying 25 overhead. Can you tell me about how high in the air it was? 2 A. Fifteen, 20 feet maybe.").

[101] Ex. L (Dep. of Jason Jorgenson) at 88, line 18 – 89, line 1.

[102] Ex. L (Dep. of Jason Jorgenson) at 89, line 13-17.

the instruction to deploy these grenades "overhand 10-15 feet into the crowd" was given by SOD supervisors at the pre-operation briefing, hours before the SOD officers were dispatched to the expressway.[103]

Moreover, Defendant's 30(b)(6) designee testified that after a full investigation, NOPD determined that it had given no warnings to protesters that gas munitions were going to be deployed prior to deploying tear gas grenades onto them.[104]

From this evidence, a jury could certainly determine that, to plan ahead of time and then follow through with the plan to deploy tear gas grenades over the heads of protesters, 10-15 feet into a crowd, without warning to the crowd, foreseeably hitting a peaceful protester in the head, and subjecting her to injuries ranging from a broken tailbone, to a head wound requiring 12 stitches, and a traumatic brain injury that resulted in speech delay, cognitive delay, and memory loss, was dangerous and objectively unreasonable.

    C.   <u>Individually sued Defendants are individually liable based on the specific actions they took, violating Ms. Archer's right to be free from excessive force.</u>

Defendants assert that those of them sued in their individual capacity cannot be held liable without specification by Plaintiff of the individual role that each Defendant played in violating her right to be free from excessive force.[105] Defendants do not make an affirmative argument of their own or cite to any evidence in the record establishing or even suggesting that any one Defendant was uninvolved in the force used against Ms. Archer.[106] Despite the lack of any such argument,

---

[103] Ex. O (Dep. of Kenny Prepetit) at 286, line 2-7; Ex. D (Excerpts from NOPD FIT Report) at 155 of 305.
[104] Ex. G (30(b)(6) Dep. of David Barnes, Vol. II) at 17, lines 14-18 ("Q.   The department determined through its investigation that no warning to the protesters that gas would be deployed was provided in advance of its use? A.   So not by NOPD, that we're aware of.").
[105] Defendants' Memorandum in Support of Motion for Summary Judgment (ECF 193-1) at 8-9.
[106] *Id.*

Plaintiff sets out the record evidence supporting the personal liability of each individually-sued Defendant in Section II.B. of her Statement of Material Facts.

III.    Defendants' Fourteenth Amendment Argument Misunderstands the Complaint.

Defendants misconstrue the Complaint in this case as asserting an independent claim under the Fourteenth Amendment. Rather, Plaintiff asserts claims under the Fourth Amendment as incorporated against the States by the Fourteenth Amendment. The "shocks the conscience" test of *Cty. of Sacramento v. Lewis* derives from substantive due process jurisprudence, which only applies where there is no cognizable Fourth Amendment claim. [107]

IV.    *Monell* Claims and State Law Claims

Defendants' *Monell* argument relies completely on the proposition that Plaintiff failed to establish facts from which a reasonable jury could find excessive force.[108] Defendants do not contend that Ms. Archer failed to meet any other of the elements of *Monell*.

Similarly, Defendants assert that the state law claims should be dismissed solely on the basis that the conduct of Defendants did not constitute excessive force. As discussed above, there is ample support in the record from which a reasonable jury could determine that Defendants did violate Ms. Archer's right to be free from excessive force when they hit her in the head with a tear gas grenade causing serious injury. Defendants, on the other hand, reference no record evidence to the contrary. Summary judgment is precluded on these claims as well.

For these reasons, and on the basis of the evidence outlined in Plaintiff Archer's Statement of Material Facts, Plaintiff Archer respectfully requests that the Court deny Defendants' motion.

---

[107] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1988).
[108] Defendants' Memorandum in Support of Motion for Summary Judgment (ECF 193-1) at 9.

Respectfully Submitted, this the 10th day of September, 2024.


*/s/ Hannah A. Lommers-Johnson*
Hannah A. Lommers-Johnson, La. Bar No. 34944, T.A.
James W. Craig, La. Bar No. 33687
Emily M. Washington, La. Bar No. 34143
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
hannah.lommersjohnson@macarthurjustice.org
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

*Attorneys for Plaintiff Katharine Archer*