**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KATHARINE ARCHER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-1079** |
| **CITY OF NEW ORLEANS, ET AL.** | **SECTION: "P" (5)** |

**ORDER AND REASONS**

Before the Court is the Motion for Summary Judgment filed by Defendants, the City of New Orleans, its mayor, and various officials and officers of the New Orleans Police Department ("NOPD").[1] Defendants seek summary judgment on "all of [Plaintiff]'s claims."[2] Plaintiff, Katharine Archer, opposes the Motion.[3] For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**BACKGROUND**

In May 2020, the death of George Floyd sparked protests throughout the nation.[4] This action arises out of one such protest.[5] On June 3, 2020, more than 1,000 people gathered in New Orleans, to march for "an end to police violence against people of color."[6] Plaintiff claims to have attended this demonstration peacefully and did not herself engage in any acts of violence;[7] Defendants do not dispute this assertion. The march proceeded through New Orleans, escorted by

---

[1] R. Doc. 37.
[2] R. Doc. 37-1 at 2.
[3] R. Doc. 38.
[4] *Williams v. Davis*, No. 22-30181, 2023 WL 119452, at *1 (5th Cir. Jan. 6, 2023); *Utley v. City of Houston*, No. 21-20623, 2022 WL 2188529, at *1 (5th Cir. June 17, 2022) (discussing § 1983 litigation brought as a result of arrest made at a protest following the death of George Floyd); *Cheairs v. City of Seattle*, 145 F.4th 1233, 1235 (9th Cir. 2025) ("[A] crowd gathered in Seattle to protest the killing of George Floyd."); *Epps v. Christian*, 173 F.4th 1236, 1239 (10th Cir. 2026) ("This appeal stems from . . . the response of the Denver Police Department ("DPD") and its officers to demonstrations against police brutality sparked by the death of George Floyd . . . ."); *Kirby v. Sheriff of Jacksonville*, No. 22-11109, 2023 WL 2624376, at *1 (11th Cir. Mar. 24, 2023) (discussing demonstration in Jacksonville, Florida, protesting the death of George Floyd).
[5] R. Doc. 1 at 11.
[6] *Id.* at 11; R. Doc. 38-1 at 3; *see also* R. Doc. 38-5 at 15.
[7] R. Doc. 38 at 1.

NOPD officers, and onto an elevated portion of U.S. Highway 90 in an attempt to march across the Crescent City Connection, a pair of cantilever bridges that carry Highway 90 over the Mississippi River.[8]

In response to the June 3 protest, the NOPD created a chain of command. Deputy Superintendent John Thomas ("Thomas") was the Incident Commander for the NOPD.[9] Although not on the elevated portion of Highway 90 during the events of June 3, 2020, Thomas was in radio contact with members of the NOPD on the scene.[10] Captain Lejon Roberts ("Roberts") was the On-Scene Incident Commander and the Operations Commander.[11] Roberts was on the elevated portion of Highway 90 before and during the incident.[12]

Captain Bryan Lampard ("Lampard") was the Tactical Commander for the NOPD on the night of June 3, 2020.[13] In that capacity, Lampard was on the elevated highway, and in control of the NOPD Special Operations Division ("SOD") officers—including the Grenadier and Gas Deployment Team (the "Orange Team")—present in response to the incident.[14] Lieutenant Kenny Prepetit ("Prepetit") was Assistant Tactical Commander for NOPD on the night of June 3, 2020.[15] Prepetit reported to Lampard, and was present on the elevated highway during the incident.[16]

Sergeant Damond Harris ("Harris") was Team Leader of the Orange Team.[17] Harris was present on the elevated highway during the incident, and relayed orders to members of the Orange

---

[8] R. Doc. 37-2 at 2; R. Doc. 38-1 at 2 (contesting only Defendants' assertion that the protestors' entry onto Highway 90 was illegal).
[9] R. Doc. 38-1 at 5.
[10] R. Doc. 1 at 4; *see also* R. Doc. 38-2 (discussing, among other things, Thomas's radio communications on the night of June 3, 2020).
[11] R. Doc. 38-16 at 6.
[12] *Id.* at 7.
[13] R. Doc. 38-1 at 7 ("Defendant Bryan Lampard, Commander of SOD and the Tactical Commander for the protest . . . .").
[14] *Id.* at 8, 17–18 ("Under NOPD Policy 46.7, Tactical Commander and head of SOD, Bryan Lampard had authority to order the deployment of SOD munitions, including gas.").
[15] *Id.* at 18.
[16] *Id.*
[17] *Id.* at 23; R. Doc. 38-17 at 12.

Team to deploy gas munitions.[18] Officers Travis Johnson ("Johnson") and Jason Jorgenson ("Jorgenson") were members of the Orange Team.[19] As part of the Orange Team, Johnson and Jorgenson were assigned to carry supply bags containing less-than-lethal munitions, and to deploy CS gas cannisters ("tear gas cannisters") by hand.[20] Detectives Michael Pierce ("Pierce") and Devin Joseph ("Joseph") were members of the Orange Team.[21] As members of the Orange Team, Pierce and Joseph were assigned to use 40 mm Launchers to deploy less-than-lethal munitions.[22]

On the elevated roadway leading to the Crescent City Connection, the NOPD formed a police line that spanned the width of the roadway.[23] After negotiations between the NOPD and informal leaders of the protest broke down, some protestors attempted to force their way through the police line, and across the Crescent City Connection.[24] As a result, the NOPD's police line began to breakdown.[25] Lampard, as Tactical Commander, gave the order to deploy gas munitions.[26] This order was relayed by Prepetit to the Orange Team.[27] Harris, in turn, as Team Leader of the Orange Team, repeated the order to Johnson, Jorgenson, Pierce, and Joseph. The four members of the Orange Team then deployed less-than-lethal munitions against the protestors.[28] These less-than-lethal munitions included tear gas cannisters, Direct Impact CS gas launchable projectiles,

---

[18] R. Doc. 38-1 at 9.
[19] R. Doc. 38-17 at 12.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] R. Doc. 37-2 at 2.
[24] *Compare id.*; *with* R. Doc. 38-1 at 3.
[25] R. Doc. 38 at 11 ("[Defendants] ordered the deployment of gas munitions to stop protesters from proceeding forward across the bridge when the skirmish line broke down.").
[26] R. Doc. 38-1 at 8.
[27] *Id.*
[28] *Id.* at 3–4 ("NOPD deployed chemical munitions because it had established a police line to prevent protesters from moving forward across the bridge, and the police line was broken by some individuals pushing past it.").

impact "marking" rounds, and 60 mm rubber ball projectiles.[29] The NOPD did not issue a warning to the protestors before they deployed the less-than-lethal munitions.[30]

The NOPD determined that Plaintiff was struck in the head by a hand-thrown CS-gas cannister.[31] She suffered injuries including a gash on her head, a fractured coccyx, and diagnoses of cognitive communication deficits and post-traumatic stress disorder.[32]

Plaintiff claims Defendants—LaToya Cantrell ("Cantrell"), Shaun D. Ferguson ("Ferguson"), Thomas, Roberts, Lampard, Prepetit, Todd Morrell ("Morrell"), Michael Crawford ("Crawford"), Dylen Pazon ("Pazon"), Pierce, Harris, Joseph, Jorgenson, Johnson, and the City of New Orleans—violated her rights under the Fourth Amendment, as incorporated by the Fourteenth Amendment against the States, of the United States Constitution, and also committed multiple state law torts in the process.[33] The Defendants contend that Plaintiff's injuries were the result of constitutionally reasonable force applied to disperse the crowd of protestors that had illegally entered the roadway.[34]

The Court now turns to the procedural history of this matter. Plaintiff filed her eight-count Complaint on June 3, 2021.[35] Plaintiff's Complaint alleges: (1) individual violations of Plaintiff's Fourth Amendment and Fourteenth Amendment rights, (2) violations of Plaintiff's Fourth and Fourteenth Amendment rights due to a failure to intervene, (3) violations of Plaintiff's Fourth and

---

[29] R. Doc. 1 at 8.
[30] R. Doc. 38-8 at 2.
[31] R. Doc. 38-5 at 2.
[32] R. Doc. 38 at 12 n.50.
[33] *See* R. Doc. 1. Plaintiff does not assert any independent Fourteenth Amendment claims. R. Doc. 38 at 25 ("Defendants misconstrue the Complaint in this case as asserting an independent claim under the Fourteenth Amendment. Rather, Plaintiff asserts claims under the Fourth Amendment as incorporated against the States by the Fourteenth Amendment."). Because Plaintiff asserts no independent Fourteenth Amendment claims, the Court denies Defendants' motion for summary judgment as to these claims as moot.
[34] R. Doc. 37-1 at 2 ("[T]he force applied was objectively reasonable under the totality of the circumstances."); *id.* at 8 ("[T]he crowd illegally entered Highway 90.").
[35] R. Doc. 1.

Fourteenth Amendment rights due to a failure to properly train, supervise, and discipline, (4) violations of Plaintiff's Fourth and Fourteenth Amendment rights by failing to supervise, (5) *Monell* claim for a violation of Plaintiff's Fourth and Fourteenth Amendment rights, (6) Louisiana state law assault, battery, and negligence, (7) Louisiana state law intentional infliction of emotional distress, and (8) Louisiana state law negligent infliction of emotional distress.[36]

**SUMMARY JUDGMENT STANDARD**

"Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[37] Typically, "the party who moves for summary judgment bears the initial burden . . . . [of] showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial."[38] "For a defendant, this means showing that the record cannot support a win for the plaintiff—either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim."[39] "If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there *is* a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor."[40]

**QUALIFIED IMMUNITY**

But the doctrine of qualified immunity "changes the nature of the summary-judgment burden," including "how and when the burden shifts, and what it takes to satisfy the burden."[41]

---

[36] *Id.*
[37] *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016).
[38] *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020) (explaining the intersection of multiple legal standards, including qualified immunity and summary judgment, on review of district court's denial of defendants–officers' motion for summary judgment).
[39] *Id.*
[40] *Id.*
[41] *Id.*

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[42] This creates an affirmative defense "that shields public officials sued in their individual capacities[.]"[43] Accordingly, "[w]hen reviewing a motion for summary judgment based upon the affirmative defense of qualified immunity, we engage in a two-pronged inquiry."[44] The first prong is "the constitutional question, asking whether the officer's conduct violated a federal right."[45] The second prong asks "whether that right was clearly established at the time of the violation."[46] "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"[47]

Whether or not qualified immunity is involved, "[a] plaintiff suing for a constitutional violation has the ultimate burden" in proving the first prong—that is, "to show that the defendant violated a constitutional right."[48] "But when qualified immunity is involved . . . a plaintiff has the additional burden to show that the violated right was 'clearly established' at the time of the alleged violation."[49] "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law."[50] "For a right to be clearly established, the 'constitutional

---

[42] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).
[43] *Bartlett*, 981 F.3d at 328.
[44] *Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022), *abrogated on other grounds by Tuttle v. Gallegos*, 180 F.4th 209 (5th Cir, 2026).
[45] *Id.* (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)).
[46] *Id.* (citing *Tolan*, 572 U.S. at 656).
[47] *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Pearson*, 555 U.S. at 236)).
[48] *Bartlett*, 981 F.3d at 329 (citing *Pearson*, 555 U.S. at 232).
[49] *Id.* (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)).
[50] *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998)).

question' must be 'beyond debate.'"[51] This requires Plaintiff to "'identify' controlling authority 'where an officer acting under similar circumstances was held to have violated the Constitution[,]'"[52] "identify 'a robust consensus of cases of persuasive authority' in which officers acting under similar circumstances were found to have violated the Constitution[,]"[53] or "plaintiff may demonstrate 'the rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.'"[54] "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'"[55] "In short, officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct."[56]

Thus, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'"[57] "In other words, . . . the public official need *not* show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law."[58]

"[Q]ualified immunity similarly changes the court's normal task on summary judgment."[59] A court must decide whether summary judgment is appropriate by "view[ing] the facts in the light most favorable to the nonmoving party and draw[ing] all reasonable inferences in its favor"—per

---

[51] *Hughey v. Tippah Cnty.*, No. 25-60232, 2026 WL 2444314, at *2 (5th Cir. Aug. 20, 2026) (quoting *Dilworth v. Tucker*, 179 F.4th 992, 996 (5th Cir. 2026)).
[52] *Id.* (quoting *Dilworth*, 179 F.4th at 996–97).
[53] *Id.* (quoting *Dilworth*, 179 F.4th at 997).
[54] *Id.* (quoting *Dilworth*, 179 F.4th at 997).
[55] *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).
[56] *Id.* (alteration in original) (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)).
[57] *Bartlett*, 981 F.3d at 329–30 (quoting *Orr*, 844 F.3d at 490).
[58] *Id.* at 330 (emphasis added).
[59] *Id.*

the usual summary judgment standard—and "then determining whether the *plaintiff* can prove a constitutional violation . . . that was clearly established . . . ."[60] "Where a plaintiff fails to cite or identify law clearly establishing a constitutional violation, denial of qualified immunity is not justified even if, given the state of the law, the plaintiff 'could have done so.'"[61] With this burden-shifting framework in mind, the Court now turns to the substantive law and arguments.

## LAW AND ANALYSIS

Defendants seek summary judgment "on all of [Plaintiff]'s claims."[62]In her Complaint, Plaintiff asserts eight claims for relief: five under 42 U.S.C. § 1983 and three under Louisiana state law.

"Section 1983 provides a remedy against 'every person,' who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States."[63] "Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983[,]" and here the existence of a constitutional violation is crucial to Plaintiff's five claims brought under § 1983.[64] If there is no genuine dispute of material fact as to the non-existence of a constitutional violation, those claims, along with the Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343, fall away. So too then the Court's supplemental jurisdiction under 28 U.S.C. § 1367 over the three remaining state law claims may also fall away.[65]

### I. Plaintiff failed to acknowledge qualified immunity's burden-shifting scheme on summary judgment.

---

[60] *Id.* (alteration in original) (emphasis added).
[61] *Lee v. Lawrence*, No. 23-1229, 2026 WL 2350404, at *8 (M.D. La. Aug. 13, 2026) (Dick, C.J.) (quoting *Bartlett*, 981 F.3d at 329 at 345).
[62] R. Doc. 37-1 at 2.
[63] *Tapps v. McClendon*, No. 22-13, 2023 WL 5751163, at *4 (E.D. La. Sep. 6, 2023) (first citing 42 U.S.C. § 1983; and then citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).
[64] *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1574 (5th Cir. 1989).
[65] *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— (3) the district court has dismissed all claims over which it has original jurisdiction . . . .").

As a preliminary matter, Plaintiff asserts that Defendants' Motion must be denied regardless of Plaintiff's response because "Defendants have failed in their burden as the moving party to meet their initial burden . . . ."[66] Plaintiff is incorrect. In their Memorandum in Support of Motion for Summary Judgment, Defendants contest the existence of a constitutional violation *before* invoking qualified immunity as an affirmative defense.[67]

Plaintiff's argument plainly ignores qualified immunity's burden-shifting scheme on summary judgment. In fact, Plaintiff's Opposition does not even mention or acknowledge it.[68] But the Fifth Circuit has made clear that when qualified immunity is involved, it is on the plaintiff to prove that there was a constitutional violation, and that the defendants' conduct violated clearly established law.[69] Defendants were only required to make a good faith claim of qualified immunity to shift this burden to Plaintiff. Defendants have done so. Therefore, the Court rejects Plaintiff's argument, and continues with an analysis of each of Plaintiff's claims.

## II. Genuine issues of material fact preclude summary judgment on the merits of Plaintiff's claim of individual violations of her Fourth and Fourteenth Amendment rights.

Plaintiff's § 1983 claims rest on a person's right under the Fourth Amendment to be free from excessive force during a seizure.[70] "To bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that she was seized."[71] Second, the plaintiff must show that she "suffered (1) an injury that (2) resulted directly and only from the use of force that was

---

[66] *See* R. Doc. 38 at 4.
[67] *See* R. Doc. 37-1.
[68] *See* R. Doc. 38.
[69] *Barlett*, 981 F.3d at 329–30; *see also Crane v. City of Arlington*, 50 F.4th 453, 461 (5th Cir. 2022) (quoting *Aguirre v. City of San Antonio*, 995 F.3d 395 (5th Cir. 2021)) ("When a defendant official moves for summary judgment on the basis of qualified immunity, 'the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.'"), *abrogated on other grounds by Tuttle v. Gallegos*, 180 F.4th 209 (5th Cir, 2026); *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012) ("When a defendant asserts qualified immunity, the plaintiff has the burden of proving that it is inapplicable.").
[70] *See* R. Doc. 1; *see also Graham v. Connor*, 490 U.S. 386, 394 (1989).
[71] *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citing *Graham*, 490 U.S. at 388).

excessive to the need and that (3) the force used was objectively unreasonable."[72] Thus, the threshold question is whether Plaintiff was seized within the meaning of the Fourth Amendment.

*A. Genuine issues of material fact exist regarding whether Plaintiff was seized under the Fourth Amendment.*

In their Motion for Summary Judgment, Defendants assert that Plaintiff was not seized when she was hit in the head by a tear gas cannister.[73] Defendants rest this assertion on the argument that Defendants intended to disperse the crowd of protestors—not to restrain them—when the tear gas canister was thrown.[74] Defendants' argument relies on the United States Supreme Court's decision in *Torres v. Madrid*, a 2021 case where the Court explored the meaning of *seizure* in the context of a suspect who was struck by an officer's bullets but had temporarily eluded capture.[75] Meanwhile, in her Opposition, Plaintiff contends Defendants did, in fact, intend to restrain the protestors, because they intended to restrain the protestors' freedom to choose where to move, and Plaintiff's freedom of movement was terminated by the precise means intentionally applied to restrain them—the tear gas cannisters.[76] Plaintiff relies on a sister case of *Torres*, *Brower v. County of Inyo*, where the United States Supreme Court found that the use of a roadblock to stop a driver in a stolen car also constituted a *seizure*.[77]

Although not decisive here, it is important to note that *Torres* and *Brower* each concern two different types of seizures: (1) seizure by force (*Torres*) and (2) seizure by control (*Brower*).[78] Yet,

---

[72] *Id.* (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)).
[73] *See* R. Doc. 37-1 at 2.
[74] *Id.*
[75] *See* 592 U.S. 306 (2021).
[76] *See* R. Doc. 38 at 7–12.
[77] *See Brower*, 489 U.S. 593 (1989).
[78] *See Torres*, 592 U.S. at 322 ("Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement. A prime example of the latter comes from *Brower* . . . .").

these two cases, or two types of seizures, are two sides of the same coin because each requires the intent to restrain its target, which is the crux of the issue.[79]

Intent is a question of fact. Because Plaintiff and Defendants dispute the intent with which Defendants deployed the tear gas cannisters, the Court must favor the nonmovant. Under the assumption that Defendants deployed the tear gas cannisters with the intent to restrain the protestors from moving across the Crescent City Connection, Defendants' application of force—deployment of less-than-lethal munitions, including the tear gas grenade which struck Plaintiff—was carried out with the *intent to restrain* the protestors.[80] Thus, under *Torres*, the Defendants' actions would constitute a seizure under the Fourth Amendment.

The Court does not hold that a seizure did in fact occur; the Court only holds that there is a genuine issue of material fact as to whether a seizure occurred, and, at this stage of the litigation, the Court must make the inference in favor of the nonmovant. In other words, a reasonable jury could find that a seizure occurred, and the Fourth Amendment, as incorporated by the Fourteenth Amendment against the States, applies to the facts of this case.

*B. Genuine issues of material fact exist regarding whether the force used by Defendants was objectively unreasonable.*

Defendants claim their conduct was objectively reasonable under the totality of the circumstances.[81] To support this claim, Defendants point to the fact that they "attempted to engage

---

[79] *See id.* at 325 ("We hold that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."); *Brower*, 489 U.S. at 599 ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that . . . Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped."); *see also Flores*, 381 F.3d at 396 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)) ("An officer seizes a person when he, 'by means of physical force *or* show of authority, has in some way restrained the liberty of a citizen.'").
[80] *See Torres*, 592 U.S. 306; *Brower*, 489 U.S. 593.
[81] R. Doc. 37-1 at 3.

with protest leaders in an effort to have them exit the bridge peacefully."[82] Only after negotiations failed, and some protestors attempted to force their way across the police line, did the Defendants deploy less-than-lethal munitions, including tear gas cannisters.[83] The deployment, Defendants assert, was objectively reasonable in light of the physical confrontation.

In retort, Plaintiff asserts that "a particular use of force is excessive in violation of the Fourth Amendment if it is not justified by [the] factors set out by the Supreme Court in *Graham v. Connor*: 'the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether [she] was actively resisting arrest or attempting to evade arrest by flight.'"[84] Plaintiff claims that none of these three factors weigh in favor of Defendants' use of force.

Plaintiff's argument, however, misunderstands the inquiry set forth in *Graham*. She treats the specific factors enunciated as an exhaustive list of the factors to be considered when assessing the reasonableness of force applied under the Fourth Amendment. The U.S. Supreme Court, however, stated the proper application of the Fourth Amendment's reasonableness test "requires careful attention to the facts and circumstances of each particular case, *including* the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[85] "This list is not exclusive . . . and the Court may examine the totality of the circumstances."[86]

---

[82] *Id.* at 5. *But see* R. Doc. 38-1 at 3 ("Protesters were told that they could stay on the expressway for a while to protest and then would have to exit. Unofficial protest leaders reported to the other protesters that, during their conversation with NOPD leaders, NOPD had not deescalated and instead had threatened to shoot, beat, and hurt the protesters.").
[83] R. Doc. 38-1 at 3.
[84] R. Doc. 38 at 13 (quoting *Graham*, 490 U.S. at 396).
[85] *Graham*, 490 U.S. at 396 (emphasis added) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).
[86] *Imani v. City of Baton Rouge*, 614 F.Supp.3d 306, 368 (M.D. La. 2022) (quoting *Drumgole v. Frumveller*, No. 14-2827, 2015 WL 2250134, at *8 (E.D. La. May 13, 2015))

In *Graham*, a diabetic man, Graham, went to a convenience store, in an effort to stave off an insulin reaction.[87] A nearby police officer observed Graham's behavior, became suspicious, and made an investigatory stop.[88] During the course of the stop, Graham was handcuffed, had his face shoved into the hood of a car, and was thrown headfirst into the police car; Graham suffered injuries including, among others, a broken foot, bruised forehead, and an injured shoulder.[89] In that situation, the three *Graham* factors were sufficient to analyze the totality of the circumstances. Graham was not committing a crime of any severity, Graham posed no real threat to the officers or others, and Graham was not resisting or attempting to evade arrest. Police were confronted with an individual, in the relatively controlled setting (certainly compared to a 1,000-plus-person protest) of a traffic stop. Assessment of anything other than Graham's behavior was unnecessary. But that is not the situation Defendants faced on June 3, 2020. Yet, even when the totality of the circumstances is properly taken into account, the Court finds genuine issues of material fact exist as to whether Defendants' actions were objectively reasonable, precluding summary judgment on the merits.[90]

Plaintiff has pointed to evidence in the record establishing a genuine issue of material fact as to whether Defendants' conduct was objectively unreasonable, specifically whether the method and manner of deploying the tear gas was objectively unreasonable, including, the fact an overhand toss, ten to fifteen feet into the crowd, as instructed during the SOD pre-operation briefing, was used to deploy the tear gas cannisters,[91] the fact no warnings were given to the protestors before

---

[87] *Graham*, 490 U.S. at 388.
[88] *Id.* at 389.
[89] *Id.*
[90] The Court is cognizant that "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 411 (5th Cir. 2009), *abrogated on other grounds by Mullenix v. Luna*, 577 U.S. 7 (2015).
[91] R. Doc. 38-1 at 8–9. In fact, video evidence shows an unidentified NOPD officer deploying, what appears to be, a tear gas cannister from a distance significantly behind the police line. R. Doc. 38-27 at 00:06–00:10.

tear gas was deployed,[92] as well as the fact Roberts, and the NOPD, failed to communicate with the protestors, using the Long Range Acoustic Device ("LRAD"), after the informal protest leaders told the crowd "[the] NOPD had threated to shoot, beat, and hurt the protesters."[93] Based on this evidence, a reasonable jury could conclude that Defendants' conduct was objectively unreasonable. Therefore, the Court cannot grant summary judgment on the merits.

## III. Assuming a constitutional violation exists, Defendants are entitled to qualified immunity on all § 1983 claims, except for the *Monell* claim, because of the lack of clearly established law.

Even if Defendants' conduct violated Plaintiff's Fourth and Fourteenth Amendment rights, Defendants are entitled to qualified immunity because it was not clearly established in June of 2020 that Defendants' conduct was prohibited by the Fourth and Fourteenth Amendments.

When analyzing whether a defendant is entitled to qualified immunity, courts engage in a two-prong inquiry. First, the Court must determine "the constitutional question, asking whether the officer's conduct violated a federal right."[94] Second, the Court asks "whether that right was clearly established at the time of the violation."[95]

For the reasons discussed above, it is unclear whether the order to deploy tear gas, and the subsequent deployment of tear gas, on the night of June 3, 2020, constitute a violation of Plaintiff's constitutional rights. The Court is, therefore, free to begin, and, in this case, end its qualified immunity analysis with the second prong: whether the right was clearly established.[96]

*A. Plaintiff's Fourth and Fourteenth Amendment Excessive Force Claims.*

---

[92] R. Doc. 38-1 at 9–10.
[93] *Id.* at 7.
[94] *Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022), *abrogated on other grounds by Tuttle v. Gallegos*, 180 F.4th 209 (5th Cir, 2026).
[95] *Id.*
[96] *See Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

Plaintiff's first claim, brought pursuant to § 1983, alleges that the conduct of Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, and Harris, in their individual capacities, violated her Fourth and Fourteenth Amendment rights to be free from excessive force during a seizure.[97] Johnson, Pierce, Jorgenson, and Joseph are members of the Orange Team—the NOPD officers who deployed tear gas on June 3, 2020.[98] Thomas, Roberts, Lampard, Prepetit, and Harris form the chain of command that issued the order to deploy tear gas on June 3, 2020. As the claims against all of these defendants stem from a single action, and the parties do not suggest that the circumstances faced by individual defendants materially differ in any way, the Court will proceed with a single qualified immunity analysis here because there is no need, in this particular case, to separately analyze the individual actions of each officer.

Plaintiff claims that the "launching or throwing [of] tear gas grenades" at Plaintiff "while she was peacefully protesting" was "unnecessary, unreasonable, and excessive force."[99] Assuming, without deciding, that Defendants' conduct violated the Fourth Amendment, it was not clearly established in June of 2020 that the use of tear gas, in response to protestors forcing their way through a police line, and in an effort to restrain other protestors from moving across the police line, was a violation of the Fourth Amendment. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[100] To meet this burden, Plaintiff must point to a Supreme Court or Fifth Circuit decision on point, or a robust consensus of authority from other courts that have previously recognized Defendants' conduct to be a constitutional violation.[101] While a case directly on point

---

[97] R. Doc. 1 at 25–26 (Count One).
[98] R. Doc. 38-17 at 12.
[99] R. Doc. 1 at 25.
[100] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).
[101] *Hughey v. Tippah Cnty.*, No. 25-60232, 2026 WL 2444314, at *2 (5th Cir. Aug. 20, 2026) (quoting *Dilworth v. Tucker*, 179 F.4th 992, 996 (5th Cir. 2026)).

is not required, Plaintiff had to show that Defendants were on notice that their conduct was unlawful in the situation they confronted.[102]

Plaintiff points to no such jurisprudence. Instead, Plaintiff argues that under *Graham*, the force ordered and used by the NOPD officers was unreasonable. Specifically, Plaintiff asserts that she was not committing a crime of any severity,[103] she was not a threat,[104] and she was not resisting or evading arrest.[105] In the rare obvious case, the *Graham* factors may be used to independently establish the basis for denying qualified immunity.[106] This is not such a case, and general principles, such as those represented by the *Graham* factors, "do not suffice."[107]

Moreover, Plaintiff relies on cases involving a single officer and a single plaintiff, or a small number of each, interacting in comparatively controlled settings. Many of these cases involve an officer's use of "hands on" force—in other words, direct blows or the use of tasers—against a single individual. In *Darden v. City of Fort Worth*, officers tased and choked an individual during the execution of a no-knock warrant;[108] in *Newman v. Guedry*, officers hit and tased an individual during a traffic stop;[109] in *Bush v. Strain*, an officer slammed an individual's face into the rear window of an automobile;[110] and in *Cooper v. Brown*, an officer allowed a police canine

---

[102] *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022).
[103] R. Doc. 38 at 16 ("The severity of any uncharged conduct by Ms. Archer could at most be said to have been obstruction of a public highway, a misdemeanor offense, for simply being present in the roadway."). The Court agrees with Plaintiff that the Fifth Circuit's decision in *Williams v. Davis*, No. 22-30181, 2023 WL 119452 (5th Cir. Jan. 6, 2023), does not create "law of the case" regarding whether the protestors were engaged in constitutionally protected activity. R. Doc. 38 at 18. But this point does not impact the Court's analysis because whether Plaintiff was engaged in constitutionally protected activity is not considered when determining the existence of a Fourth Amendment claim, nor when determining whether Plaintiff's right was clearly established.
[104] R. Doc. 38 at 20 ("There is no evidence supporting that Ms. Archer was posing an immediate threat, or any threat, to anyone—police officer or otherwise.").
[105] *Id.* at 21.
[106] *Id.*
[107] *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)).
[108] *Darden*, 880 F.3d 722 (5th Cir. 2018).
[109] *Newman*, 703 F.3d 757 (5th Cir. 2012).
[110] *Bush*, 513 F.3d 492 (5th Cir. 2008).

to continuously bite a compliant suspect for more than two minutes.[111] Cases regarding individualized, "hands on" uses of force, such as those cited by Plaintiff, do little, if anything, to place officers on notice that their conduct in releasing tear gas in a large crowd of protestors is unconstitutional.[112] Because these cases do not give fair warning that the order to deploy, and subsequent deployment of, tear gas would violate the Fourth Amendment, Plaintiff's reliance on them is misplaced.

Plaintiff is correct that "[q]ualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel[,]"[113] but the Court's rejection of Plaintiff's argument does not rest on the instrumentality used to apply the force, it rests on the generality with which Plaintiff attempts to define the contours of the right. "[W]hile the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene."[114] "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'"[115] Here, Defendants were faced with a large crowd of protestors numbering more than 1,000.[116] By Plaintiff's own admission, some of her fellow protestors attempted to force themselves across the police line.[117] Only then did Defendants deploy tear gas. While Plaintiff does not need to provide a decision where a court held these *exact* circumstances to be a violation of the Fourth Amendment, Plaintiff is required to show that any reasonable officer faced with these

---

[111] *Cooper*, 844 F.3d 517 (5th Cir. 2016).
[112] *Cf. Singleton v. Darby*, 609 F.App'x 190, 196 (5th Cir. 2015) (finding defendant was entitled to qualified immunity because plaintiff could not produce any caselaw with analogous facts).
[113] *Newman*, 703 F.3d at 763–64.
[114] *Bush*, 513 F.3d at 502 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).
[115] *Darden*, 880 F.3d at 728 (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).
[116] R. Doc. 38-1 at 3.
[117] *Id.*

circumstances would have known his conduct violated the Fourth Amendment. Plaintiff has not done so.[118] Accordingly, Defendants are entitled to qualified immunity on Plaintiff's Fourth and Fourteenth Amendment claims for use of excessive force.

*B. Plaintiff's Fourth and Fourteenth Amendment Claims for Failure to Intervene*

Plaintiff next asserts claims against Johnson, Pierce, Jorgenson, Joseph, Thomas, Roberts, Lampard, Prepetit, Harris, and Pazon,[119] in their individual capacities, alleging these defendants had a constitutional duty to intervene to stop or prevent excessive force from being used against her.[120] "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act."[121]

Assuming, without deciding, that a constitutional violation occurred, Plaintiff has the burden to demonstrate that the law was "clearly established."[122] That is, Plaintiff must show "any reasonable officer would have known to intervene under these circumstances."[123] Plaintiff points

---

[118] Moreover, the Court notes that what little jurisprudence exists on the topic indicates that the right Plaintiff seeks to vindicate is not clearly established. *See, e.g.*, *Singleton*, 609 F.App'x 190 (granting qualified immunity where there was no caselaw involving similar crowd control scenarios); *Hill v. Sheriff's Office Iberia Parish*, No. 07-1607, 2009 WL 928080, at *4 (W.D. La. Mar. 28, 2009) (holding officers' actions were objectively reasonable when they used tear gas to disperse crowd from roadway after festival had ended), *aff'd sub nom. Hill v. Hebert*, 389 F.App'x 414 (5th Cir. 2010); *Talley v. City of Austin*, No. 21-CV-249, 2024 WL 5159912 (W.D. Tex. Dec. 17, 2024) (holding right was not clearly established in situation where police shot protestor twelve times with beanbag rounds after protestor threw water bottle); *see also Schukar v. Kenosha Cnty.*, 183 F.4th 508, 515 (7th Cir. 2026) (holding officers were entitled to qualified immunity because "it was not clearly established in 2020 that an officer who intentionally deploys less-than-lethal munitions during a protest seizes an unintended target within the meaning of the Fourth Amendment").

[119] Officer Dylen Pazon was the NOPD's Special Operations Division training officer. R. Doc. 38-23 at 2. Although not included in the NOPD's chain of command which ordered the deployment of tear gas, Pazon was present on the elevated roadway the night of June 3, 2020, and, at times, distributed munitions to the Orange Team and directed the Orange Team as to deploying the tear gas. R. Doc. 38-1 at 22. Additionally, Pazon's responsibilities with the NOPD included "training officers on topics including the deployment of gas munitions and riot training." R. Doc. 38-1 at 22.

[120] R. Doc. 1 at 26–28 (Count Two).

[121] *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

[122] *Id.* at 345.

[123] *Id.*

to no caselaw to support that Defendants should have known of their duty to intervene in view of the circumstances she alleges.[124] Defendants are, therefore, entitled to qualified immunity on Plaintiff's Fourth and Fourteenth Amendment claims for failure to intervene.

*C. Plaintiff's Fourth and Fourteenth Amendment Claims for Failure to Train, Supervise, and Discipline*

The Court now turns to Plaintiff's § 1983 claims asserted in Counts Three and Four of her Complaint. In Count Three, Plaintiff alleges that defendants Morrell, Crawford, Pazon, and Joseph, in their individual capacities, violated her Fourth and Fourteenth Amendment rights by failing to train, supervise, or discipline their subordinates—Johnson, Pierce, Jorgenson, Joseph, and Harris—to ensure they did not violate the constitutional rights of the public.[125] In Count Four, Plaintiff alleges that defendants Cantrell, Ferguson, Thomas, Roberts, Lampard, Prepetit, Morrell, Crawford, and Pazon, in their individual capacities, violated her Fourth and Fourteenth Amendment rights by failing to supervise.[126] Although titled differently, Counts Three and Four allege identical violations of the Fourth and Fourteenth Amendments. Plaintiff brings separate counts, apparently, to distinguish between those defendants who owed a duty to supervise only by virtue of their position within the NOPD chain of command, and those defendants who had a duty to supervise by virtue of their status as a policy maker. Because the analysis is the same for both counts, the Court undertakes a combined qualified immunity analysis.

A Fourth Amendment claim for failure to supervise requires "proof that the defendant supervisor 'failed to supervise or train the subordinate official', that a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and the failure to train or

---

[124] Moreover, because the officers who directly engaged in the alleged violation of Plaintiff's Fourth and Fourteenth Amendment rights were not on notice that their conduct violated the Constitution, the Court believes it would stretch credibility to maintain the bystanders should have known they had a constitutional duty to intervene.
[125] R. Doc. 1 at 28–29.
[126] R. Doc. 1 at 29–31.

supervise amounts to deliberate indifference."[127] "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[128] "To establish deliberate indifference, 'a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation.'"[129] "[S]upervisors are entitled to qualified immunity unless *both* the underlying constitutional right and the supervisors' duty with respect to that right were clearly established."[130]

Assuming, without deciding, that Plaintiff could meet all the elements to prove the alleged constitutional violations, Plaintiff has provided no caselaw indicating that either the underlying constitutional right or the supervisory Defendants' duty were clearly established at the time of the alleged violation. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's Fourth and Fourteenth Amendment claims for failure to train, supervise, and discipline, as alleged in Counts Three and Four of the Complaint.

## IV. Genuine issues of material fact preclude summary judgment on Plaintiff's *Monell* claims.

To prevail on a *Monell* claim, a Plaintiff must show "action pursuant to official municipal policy of some nature caused a constitutional tort."[131] In their Memorandum in Support of Motion for Summary Judgment, Defendants assert only that "[t]he undisputed facts do not evidence . . . a

---

[127] *Reed v. Municipality of Taylorsville*, No. 17CV710, 2020 WL 3213419, at *7 (S.D. Miss. June 15, 2020) (Lee, J.) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).
[128] *Id.* (quoting *Brenoettsy*, 158 F.3d at 912).
[129] *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)).
[130] *Pena v. Givens*, 637 F.App'x 775, 786 (5th Cir. 2015) (first citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1994); and then citing *Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002)).
[131] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

violation of Plaintiff's constitutional rights."[132] As Plaintiff correctly observes, "Defendants do not contend that Ms. Archer failed to meet any other of the elements of *Monell*."[133]

As discussed above, genuine issues of material fact persist regarding whether Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights. Because the Court has found genuine issues of material fact to exist regarding whether Defendants' conduct violated the Fourth and Fourteenth Amendments, the Court rejects Defendants' argument. At this time, summary judgment on Plaintiff's *Monell* claim would be improper.

**V. Genuine issues of material fact preclude summary judgment on Plaintiff's Louisiana state law claims.**

Plaintiff asserts several Louisiana state law claims including: assault and battery, or in the alternative, negligence; intentional infliction of emotional distress; and negligent infliction of emotional distress. These claims are all premised on the same factual allegations as Plaintiff's federal claims.

*A. Assault, Battery, and Negligence*

"[U]nder Louisiana law, the torts of assault and battery, when raised against a law enforcement officer acting in the course of employment, require a showing that the law enforcement officer acted with unreasonable or excessive force."[134] "Louisiana's excessive force tort mirrors its federal constitutional counterpart."[135] "[I]t is widely recognized that 'excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances.'"[136] "In other cases, the Louisiana Supreme

[132] R. Doc. 37-1 at 10.
[133] R. Doc. 38 at 25.
[134] *Rogers v. Jefferson Par. Sheriff's Off.*, No. 18-11164, 2022 WL 124028, at *7 (E.D. La. Jan. 13, 2022) (quoting *Elphage v. Gautreaux*, 969 F.Supp.2d 493, 515 (M.D. La. 2013) (citing *Gerard v. Parish of Jefferson*, 424 So.2d 440, 444 (La. App. 5 Cir. 1982))).
[135] *Deville v. Marcantel*, 567 F.3d 156, 172 (5th Cir. 2009).
[136] *Dauterive v. Marcal*, No. 22-3067, 2025 WL 3628112, at *11 (E.D. La. Dec. 15, 2025) (quoting *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019)).

Court used the duty-risk analysis to evaluate excessive force as a species of negligence[,]" and used the totality of the circumstances to analyze breach.[137] Regardless of whether Plaintiff's claims are analyzed as an intentional tort, or negligence, "[w]hether the force used is reasonable depends upon the totality of the facts and circumstances in each case[,]" just as for Plaintiff's federal claims.[138]

Accordingly, for all the same reasons the Court previously discussed and cited with respect to Plaintiff's excessive-force claims under § 1983, genuine issues of material fact preclude the court from granting summary judgment on the merits. It is up to the jury to determine the disputed facts, and, in doing so, determine if Defendants' actions constituted excessive force under Louisiana law.

*B. Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress*

To succeed on a claim for intentional infliction of emotional distress, Plaintiff must show: "(1) the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[139] Similarly, to succeed on a claim for negligent infliction of emotion distress, Plaintiff must show: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the specific

---

[137] *Bagley v. Kolb*, No. 19-10, 2021 WL 3376830, at *17 (W.D. La. Aug. 3, 2021) (first citing *Stroik v. Ponseti*, 96-2897, p. 7 (La. 9/9/97), 699 So.2d 1072, 1077–78; and then citing *Mathieu v. Imperial Toy Corp.*, 94-0952, p. 7 (La. 11/30/94), 646 So.2d 318, 323).
[138] *Deville*, 567 F.3d at 172 (citing *Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La. 1977)).
[139] *English v. Crochet*, 154 F.4th 369, 374 (5th Cir. 2025) (citations omitted) (quoting *White v. Monsanto*, 585 So.2d 1205, 1209 (La. 1991)).

standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; (5) actual damages; and (6) 'the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.'"[140]

Defendants' assert that "[t]hese claims are based on the erroneous assertion that the activities of the Defendants constituted excessive force."[141] As the Court discussed above, there are genuine issues of material fact that, at this time, preclude the Court from determining whether a constitutional violation occurred. Regardless of this genuine issue, however, Defendants' bare assertion does not satisfy their initial burden on summary judgment. Because Plaintiff would have the burden of proving each element of the emotional distress claims, Defendants could have met their burden by showing "plaintiff ha[d] a failure of proof on an essential element of its claim[.]"[142] The existence or non-existence of a constitutional violation is not an essential element of a claim for intentional, or negligent, infliction of emotional distress. Therefore, summary judgment on these claims must be denied.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment is granted insofar as Defendants are entitled to judgment as a matter of law on Counts I–IV pursuant to the doctrine of qualified immunity. Plaintiff's claims against all defendants in Counts I–IV are dismissed with prejudice. Defendants' Motion for Summary Judgment is denied as to the remaining claims in Counts V–VIII.

---

[140] *Hutchinson-Harper v. Jefferson Par. Sch. Bd.*, 2026 WL 1745675, at *6 (E.D. La. June 17, 2026) (quoting *Moresi v. State*, 567 So.2d 1081, 1096 (La. 1990)).
[141] R. Doc. 37-1 at 10.
[142] *Id.*

New Orleans, Louisiana, this 30th day of September 2026.

Darrel James Papillion

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**